## Pusey's Estate.

Argued October 11, 1935. Before Kephart, Schaffer, Maxey, Drew, Linn and Barnes, JJ.

*R. T. M. McCready*, with him *Harry S. Dunmire* and *Raymer F. Maguire*, for appellants.

*John J. Heard* and *David A. Reed*, of *Reed, Smith, Shaw & McClay*, and *John C. Bane, Jr.*, for appellees.

OPINION BY MR. CHIEF JUSTICE KEPHART, January 31, 1936:

This appeal presents some unusual features. We have a record of over 3,000 pages, with 331 exceptions, 227 assignments of error and approximately 1,000 pages of argument. The amount involved is over $1,000,000. The contest is over the validity of a will.

George W. Pusey was born October 22, 1845, in Pittsburgh, the fifth of six children. His mother was a native of Pittsburgh and his father, while not born in Pittsburgh, early adopted that city as his home. Their principal family residence was at 518 Sherman Avenue. By reason of deaths in the family Pusey became its absolute owner, and continued in its ownership up to the day of his death with the original furnishings, family portraits and contents intact. It was his only Pittsburgh residence for some fifty years prior to his death, and was in a neighborhood once distinguished by solid, well-to-do families who carried on the social and commercial life of the city. Although the neighborhood deteriorated in part, some of these families continued to reside on Sherman Avenue. None of the Pusey children, including George, ever married; he survived them all, and succeeded to all of their property including their interests in 518 Sherman Avenue.

He was engaged in business in the city for twenty years, then permanently retired at the age of 50 to spend the rest of his life in leisure with the exception of a connection in 1901 with Mr. Dahlinger, attorney for the

Pusey family for thirty-five years, upon the organization of the Allegheny Trust Company.

Pusey purchased stock shortly after the trust company's formation and for a few years served as director and for a year as chairman of the board. Although he thereafter ceased to share in its management, he continued as a stockholder and the bank remained his principal depository up to the time of his death, when he owned 112 shares and had approximately $50,000 there on deposit. He kept a safe deposit box in its vaults where his securities were lodged. Mr. Dahlinger of the Allegheny Trust Company had in his possession a cash book showing Pusey's receipts and expenditures. In Mr. Pusey's absence the key to this vault was entrusted to Mr. Dahlinger. The bank also handled the collection of his income while he was in Florida.

Mr. Pusey was a pious man and his social life was centered around the church. In 1893 upon the organization of the Calvary M. E. Church, he became a charter member. He was a trustee, vice-president and chairman of its finance committee up to the very moment of death and its principal financial supporter. He was also concerned with various other Pittsburgh charities, among which were those sponsored by the Pittsburgh Conference of the Methodist Episcopal Church, and the Young Men's and Young Women's Christian Associations of Pittsburgh. Until July of 1933 he was a member of the Pittsburgh Athletic Association, and he exhibited a constant interest in the municipal affairs of the city. Even when it was apparent to him that he would probably never be physically able to return to Pittsburgh, he wrote thanking a friend for having traffic lights installed in the neighborhood of his home.

When Mary W. Pusey, George's invalid sister, died in 1920, he was left, at seventy-two years, a lonely bachelor, the sole survivor of the direct line of a family early identified with Pittsburgh activities. Having succeeded to the property of his brothers and sisters, he was inde-

pendently wealthy; his fortune in 1929 was estimated at more than $2,000,000. Those who lived with him at 518 Sherman Avenue were Katherine G. McIntyre, originally a nurse and companion to his sister, afterwards Pusey's housekeeper, and William Sepp, his handyman and chauffeur. There were also two domestics.

In 1921 Pusey went to Florida, and visited Dr. Roland T. White for two months. The latter had lived in Pittsburgh where he had met Pusey and been active in the Calvary Church. Pusey, after his first experience with Florida climate, made regular trips to that state. They commenced in the fall and ended in the spring. At first he stayed at a hotel; then for two years lived in a leased cottage; but when the lease was repudiated in 1925, he purchased a cottage in Orlando for $25,000.

The sojourns to Florida over winter and return to Pittsburgh in summer were made regularly up to and including the summer of 1931. On June 12, 1929, Pusey made a will describing himself as domiciled in Pittsburgh. Mr. Dahlinger, who had drawn the wills of most of Pusey's brothers and sisters, also drew up this will and he and the Allegheny Trust Company were appointed executors and trustees therein. In the fall of 1931 Pusey again made his trip to Florida, but never returned to Pittsburgh alive. He died in Florida on August 31, 1933. In accordance with his testamentary directions his body was taken to Pittsburgh to be buried in the family plot.

During the winter of 1932, while living in Florida, Pusey began to manifest the signs of illness which eventually led to his death. In the winter of 1931-1932 he was often confined to bed, and he wrote stating that he felt weak and that he suffered from a severe cold and from pains and stiffness in his back and right leg. He resorted to an osteopath in an effort to find relief, but the pains persisted. There is a notation in his diary on March 20th that he had missed church, and a similar notation on March 27th. On April 10, 1932, he noted in

his diary attendance at church for the first time in six weeks. This was evidence of serious indisposition for to George W. Pusey religion, the religious affairs surrounding the church, and the persons associated with the church, constituted an integral, if not the main part of life. In June of 1932 he notes that he can only hobble about a bit with a cane and in the same month, in an effort to rid himself of the cause of the pain which so seriously circumscribed his activities, he had six of his teeth removed. He was confined to bed for a long interval thereafter suffering from the reaction. On August 12, 1932, he wrote that he was again in bed suffering from pains, which prevented him from moving or turning over and that the writing of a one-page letter was tiring to him. During all this time Pusey was under the care of Dr. White. In July of 1932 he wrote to Mr. Dahlinger asking that his 1929 will be sent to him, setting forth that he believed his will was too extravagant; his annual income which had previously ranged from $130,000 to $200,000 having fallen to $64,000. However, after he received the will from Mr. Dahlinger, he sent it back stating that he desired to make no change. His health continued to fail and in his letters he stated to various parties his physical inability to return to his home in Pittsburgh during that summer. At the same time, in a letter to his real estate agent in Pittsburgh, he requested that his home at 518 Sherman Avenue be cared for, that the pavements be kept clean and free from chalk marks. To the new preacher of the Calvary M. E. Church he expressed the hope that he would again be able to make a trip to Pittsburgh in the summer of 1933. During the fall of 1932 and the winter of 1933 there was no improvement in Pusey's health. He was confined to his bed almost all of the time except for intervals when he would hobble about the house, or sit up for a few hours or, perhaps, attempt a walk in front of the house or around the block.

In February of 1933 a change of doctors seemed necessary for Mr. Pusey and Dr. Spenser A. Folsom was selected to replace Dr. White. A trained nurse also was engaged and, from that time until his death, he was continuously attended. We infer from the evidence that Dr. White had been treating Pusey for a kidney condition, dropsy, and an enlarged prostate gland, but we may be in error as to the correct nature of the ailments treated by him. Dr. Folsom diagnosed the principal ailment as pernicious anemia and commenced treating him for that disease with liver in various forms. He also prescribed for the kidneys and applied antiseptics for the urinary tract condition. Under his care Mr. Pusey was much improved. In March of 1933 Miss Regina Sullivan, who had formerly nursed Pusey's sister, came to nurse Mr. Pusey at Miss McIntyre's request, replacing the nurse engaged in February. On May 24, 1933, Dr. Folsom was relieved and Dr. White again assumed charge. Dr. White changed the form of treatment, and in July, Pusey's physical condition had grown so much worse that he was no longer able to take care of his correspondence. On July 30th, his entire bank account at Orlando, Florida, consisting of some $17,000, was transferred by check to Miss McIntyre, the housekeeper. In August a letter was sent to Dahlinger written by Miss Regina Sullivan and signed by George W. Pusey requesting that the 1929 will be sent to Pusey. Dahlinger complied with this request and sent the will by registered mail, but feeling, due to Pusey's weak condition, that this was an unwise move went by airplane to Orlando, Florida. On the seventh day of August, within an hour after the will was delivered to Mr. Pusey's residence, he arrived at the Pusey home. After consulting with Mr. Pusey, he was directed to take the will back to Pittsburgh. Mr. Dahlinger states he found Pusey in a most serious state. Mr. Pusey had been suffering with an attack of vomiting, inability to retain food and the charts kept by his nurse, Miss Sullivan, show that he was in distressing straits.

256 

Dr. White, informed by Miss McIntyre of Mr. Dah-
linger's visit and that he had taken the will, went to
see Mr. Dahlinger, stating, as Dahlinger testifies, that
he was pressed for money and asking Mr. Dahlinger to
arrange for a new will in which he would get $500 a
month for life. Dahlinger refused to accede to this re-
quest.

Pusey continued critically ill, as is evident from the
charts prepared by his nurse, by statements of various
persons who observed Mr. Pusey and by letters written
by Miss Sullivan, the nurse. On the evening of August
19th, Dr. White states he was called on the 'phone by
Miss Sullivan and told that Mr. Pusey wanted to see him
on business. Dr. White arrived and discussed with
Pusey the drawing of a new will, suggesting the employ-
ment of Mr. Wells, an attorney who had done work for
Dr. White but who had no personal acquaintance with
Mr. Pusey. Dr. White telephoned Mr. Wells that same
evening and arranged an appointment for the following
morning which was Sunday. On Sunday morning Dr.
White consulted with Mr. Wells and left with him a
black memorandum book of Pusey's, which contained
some notations regarding the contents of the 1929 will.
From the information contained in that book and with
information imparted to him by Dr. White, Mr. Wells
made a rough draft of a will. On Sunday afternoon
Wells was taken to Mr. Pusey by Dr. White for the first
time. A conference was held and that evening Mr. Wells
prepared a final draft of the will, working on it until
half past one in the morning. On Monday morning, Au-
gust 21st, Dr. Folsom again appeared on the scene, hav-
ing been reëngaged by Dr. White on Sunday evening.
After an examination Dr. Folsom advised a blood count
and intravenous injections of liver extract. That after-
noon Wells, accompanied by two employees of his office,
visited the Pusey home and the will was executed by Mr.
Pusey. Signature on each page and at the end therof
was suggested. Although told to sign this will "George

W. Pusey" the testator was unable to do so, and in some instances wrote "G. W. Pusey." In others he put down his full signature, but the writing shows it to be scrawled and rather difficult to understand. The following morning, August 22d, Mr. Wells redrafted the will and brought it in for execution under a form requiring only one signature at the end. When Mr. Wells arrived, he brought with him Mr. Lemire, one of his law partners, for the purpose of witnessing the will. Dr. Christ who, for the first time had ben called upon to attend the testator by Dr. White, although Dr. Folsom had been there the day before, served as the other witness. By this will Dr. White and the Florida National Bank of Jacksonville are appointed executors and trustees, Dr. White and Miss Sullivan, the nurse, receive annuities, and many other changes were made from the 1929 will.

On the same day, the 22d, there was signed by Pusey a power of attorney prepared by Wells empowering the latter to receive and bring back with him to Florida from the bank in Pittsburgh all of Pusey's securities valued at about $1,000,000. For this purpose Wells and Dr. White immediately left for Pittsburgh by airplane, leaving Mr. Pusey under Dr. Christ's care. Dahlinger and the bank refused to give them the securities. They returned to Orlando on August 27, 1933, but did not report to Pusey the fact that they had been refused the securities. On the same day Mr. Pusey was removed to a hospital where he died in a few days, on August 31, 1933. The court below concluded that his death was the result of pernicious anemia and uremia (a condition secondary to his nephritis, prostatic enlargement, and chronic urinary tract infection) ; the "principal cause" of death being a terminal broncho-pneumonia.

On September 1st, the day following his death, a caveat was filed in Pittsburgh by the executors of the Florida will against the probate of the Pittsburgh will, and on the same day the same procedure was followed by Dahlinger against the probate of the Florida will in

Florida. The proceedings in Pittsburgh were heard forthwith. On September 14, 1933, the matter was certified to the orphans' court, and the 1929 will was offered and proved. Counsel representing the executors under the Florida will then offered to prove the existence of the later will. The caveators were not able to produce in court the Florida will nor any adjudication thereon as the contest in Florida was pending. Their only proof was an exemplified copy of a writing offered for probate together with other parts of the record relating to the offer. The court below excluded this evidence as incompetent; counsel relied on *Crawford v. Schooley*, 217 Pa. 429, but in that case the later will was actually produced, not a mere copy. On September 29th the court ordered the 1929 will probated.

Dahlinger who filed the caveat in Florida failed to show cause why that writing should not be admitted to probate and therefore the caveat was taken as confessed by him. However, the Women's Home Mission Society of Pittsburgh Conference, which operated the Deaconness' Home in Pittsburgh, one of the beneficiaries in the 1929 will, but omitted in the 1933 will, did appear to contest the Florida will, and, on October 27, 1933, about a month after the probate of the 1929 will had taken place in Pittsburgh, a decree was entered wherein it was adjudged that George W. Pusey was domiciled in Florida at the time of his death, that he had testamentary capacity at the time of making his 1933 will and that it was not the result of undue influence.

On November 25, 1933, an appeal was taken in Pittsburgh from the decree admitting the 1929 will to probate. The appellants were the Lavely sisters, three collateral relatives of Pusey, who were named in the 1933 will for larger amounts than they had been left in the 1929 will. Their petition alleged that at the time of Pusey's death he was domiciled in Florida where he executed a will in 1933, and prayed that the decree admitting the 1929 will be opened and the Florida will be ad-

mitted to probate and ancillary letters issue. An answer was filed by various charities named in the 1929 will in which it was denied that Pusey's domicile was in Florida and it was averred that his domicile in Pittsburgh had never been changed. It was also alleged that the 1933 will was invalid because Pusey lacked testamentary capacity at the time of its execution, and that it had been procured through the undue influence of persons alleged to be in confidential relation with testator.

In effect the proponents of the Pittsburgh will charge that the making of the new will was induced and concocted through a conspiracy upon the part of Dr. White and Miss Sullivan, though later Miss McIntyre was brought into the picture. The hearing on the petition and answer extended over six weeks. The court below found that "for eighty-seven years, ten months and nine days this old man (George W. Pusey) was domiciled in the City of Pittsburgh and never considered an abandonment of that city as his domicile. His provenance was at Pittsburgh, his friends were here, his property was here. His winter home in Florida was nothing but a substitute for hotels or rented cottages or other places for temporary residences where he and Miss McIntyre sojourned in previous years when they left the city both in winter and summer." That there was no reliable testimony "to show that Mr. Pusey abandoned his domicile of origin." That "he was residing in Florida at the time of his death but he had not abandoned his domicile at Pittsburgh, Pennsylvania." It was also found that Miss McIntyre, Dr. White and Miss Sullivan stood in a confidential relation to the testator, because of his weakness and helplessness, their intimate and dominant association with him as housekeeper and financial agent, physician, and nurse and secretary, and the making of substantial gifts to them under the Florida writing. That they were all strangers to the testator's blood and that they failed to produce credible testimony to show

that they had overcome the burden arising from the confidential relationship. That "it does not show that no deception was used and that all was fair, open, voluntary, and well understood." It also found that "it is clear from all the credible testimony that Mr. Pusey was not competent to execute the writing of August 22d [the Florida will]," and lacked testamentary capacity. It accordingly dismissed the petition and from that dismissal this appeal is taken.

At the outset of this case we are confronted by a rule of this court which has the effect of a rule of law. *We will not retry this case.* The question for us to consider is, first, whether there is evidence to support the findings of fact and whether the findings of fact support the decree. The court below and the court in banc made a thorough review of all the evidence and arrived at certain findings. If the evidence supports the findings and the findings in turn justify the decree, the decree will not be set aside: *Kahle's Est.,* 307 Pa. 212; *Phila. & Reading C. & I. Co. v. Directors of the Poor,* 311 Pa. 236; *Dible's Est.,* 316 Pa. 553; *Taylor's Est.,* 316 Pa. 557; *Lowe's Est.,* 318 Pa. 497. While section 22 (b) of the Act of June 7, 1917, P. L. 363, provides that "in all cases of appeal from a definitive sentence or decree of the orphans' court," this court shall determine the same as to right and justice, we have hitherto consistently held that in determining right, justice and equity and decreeing accordingly, we accept the findings of fact by the orphans' court as conclusively binding on us where there is testimony to support them.

The reasons are set forth in *Glenn, Appellant, v. Trees et al.,* 276 Pa. 167, where we stated, "It has been consistently held, and is well known to counsel for appellant, that the findings of fact by a chancellor have the force and effect of a verdict of a jury, and will not be disturbed if there is evidence to support them. [Authorities.] In certain stages of litigation, passing through the different channels of our judicial system,

juries and judges of the lower courts, as triers of fact, must assume full responsibility in finally determining matters submitted through the evidence for their consideration, leaving to the appellate courts the duty of correcting such errors of law or procedure as may appear in the record. These rules of jurisprudence not only speed the termination of causes, but equalize the burden of judicial labors, impressing the public mind with the importance of the tribunal of first instance; they charge these officials with the grave responsibilities undertaken in performing such duties. There is an additional reason why the rule should be as it is. In ascertaining facts, contact must be had with the witnesses and much can be learned affecting credibility from their manner in testifying. This information cannot be reduced to matters of record."

The matters involved in the present controversy depend almost entirely on a consideration of disputed evidence, and the balance must swing in favor of that deemed credible. The correctness of the conclusions on the merits must rest upon the findings of fact made by the trial judge in the court below. Able counsel have zealously prosecuted this cause, but, on appeal, it presents no unusual features differing from the many cases of like nature brought before us in respect to the findings based upon the evidence.

As we have examined the entire record, parts of it many times, we are all satisfied that the findings of fact with regard to domicile, testamentary capacity and undue influence are sustained by the evidence and that the findings support the decree.

*It must be thoroughly understood that, in cases of this character, the findings of the chancellor supported by the court in banc must be considered just as binding on appellate courts as the verdict of a jury.* Of course, if there is no evidence to support them or if it appears from the record that there is a capricious disbelief of evidence then the findings are worthless.

Appellants charge that the court below capriciously disbelieved the evidence and that its decision was prejudiced, biased and prejudged. This in effect is a charge that the relevant evidence does not support the findings. Whatever may have been in the judicial mind in the decision in the court below, we, as an appellate court, in review of their work, must look solely to the record. Appellants must sustain the charge not by inference or innuendo, but sufficient facts must appear of record to show that there has been an abuse of power. If it appears from the record that a trial judge, by his conduct, has prejudged the case or has shown bias, prejudice or a capricious disbelief in his disposition of the case, this court will not hesitate to set aside a decree based on such illegal considerations, but as these constitute the most serious charges that can be hurled against a judge the record must clearly show prejudice, bias, capricious disbelief or prejudgment.

The mere fact that a case is decided against a litigant does not sanction any of these charges. The fact that a judge, sitting as a chancellor, may severely criticize the testimony of witnesses whom he may disbelieve will not sustain such charges, nor will it nullify or otherwise affect the findings on evidence he believes credible.

There may be, here and there, inaccuracies in statements concerning the evidence in parts of the opinion, but these are natural when considering a voluminous record. The material consideration is that the inaccuracy, in no instance, is of such nature as would reflect bias, prejudice, capricious disbelief or prejudgment; and, what is still more important, no one of them nor all combined is sufficient to affect the conclusive findings on which the judgment of the court is based.

Capricious disbelief is not merely disbelieving a witness. To constitute capricious disbelief there must be a wilful, deliberate disbelief of an apparently trustworthy witness, whose testimony one of ordinary intelligence could not possibly challenge or entertain the slightest

doubt as to its truth. To charge a judge with capricious disbelief, it must be so flagrant as to be repugnant to a man of reasonable intelligence.

It is urged that as the court had ordered probate of the Pittsburgh will, "he [the trial judge] was already on record with a decree based upon an inference of Pennsylvania domicile under which approximately one million dollars of securities had been placed in the hands of the executors under an earlier will," and that as the same judge had made an order "refusing impartial custody of the estate pending a sober adjudication of the question of domicile," the trial judge, in finally deciding the issues involved, was actuated by these orders—that they had to be sustained in later proceedings, and that this was the occasion for the prejudgment. The mere fact that a judge in the course of a trial or a hearing or any proceeding in court makes an order of an interlocutory nature or an order upon which further proceedings may be based does not convict him of prejudgment when later findings are made sustaining his original action. There is no merit in the argument that because an order was made the judge would support it on further investigation no matter what future evidence might show. It would be sad, indeed, for our jurisprudence, if our judges were actuated by motives of this kind.

On the question of bias and prejudice we file with this opinion a memorandum which reviews to some extent all these questions or, at least, those that are material and were not reviewed by the court in banc. This memorandum covering more than one hundred matters will not be printed in the reports as it is of interest only to the parties in the case, but is filed as part of the opinion for such use as the parties may see fit to make of it.

There was ample evidence to justify the court's holding that Pusey retained his domicile of origin in Pittsburgh up to the day of his death. Without reviewing all the testimony which might have influenced the court below, we lay more stress on acts rather than words used

by Mr. Pusey. The ancestral home was never leased or sold, and was admittedly occupied by Pusey until 1931. It never passed out of Pusey's ownership; it contained a substantial portion of his personal effects, and remained furnished ready for use with the same interior arrangements and with its furnishings intact. There was associated with its existence in this condition the sentiment naturally created by a "home." His former business associates lived in Pittsburgh, and throughout his entire life it remained the center of all his interests: it was the center of his life's religious and charitable activities; the overwhelming bulk of his fortune remained there at all times; and his personal and intimate business or financial affairs were always centered there. He never changed the location of his securities, and almost every matter concerning his income, its collection and disbursement, was handled there. All of his securities, including those acquired during his last illness, were, at his direction, registered from the Sherman Avenue address. His federal income tax returns, including his last for the year 1932, all gave that address; they were filed at the collector's office in Pittsburgh, and the tax shown to be due was paid to the collector there. His private automobile was registered with the Bureau of Motor Vehicles in Pennsylvania, and there only, so that at the date of his death his car in Florida bore 1933 Pennsylvania license tags. He paid state and local taxes as a citizen of Pennsylvania, and refused to vote elsewhere, notwithstanding his deep interest in the presidential election in 1932. Even though his illness had progressed very far, he still maintained a marked interest in Pittsburgh municipal affairs and, twenty-four days before his death, he signified his approval of his 1929 will (in which he described himself as a Pittsburgher) by returning it to Pittsburgh for safe keeping. In contrast with this, we have the fact that he purchased in 1926 a cottage in Florida, and that he remained in Florida for 23 months preceding his death. Testimony with respect to his declara-

tions was conflicting, and much of the testimony of appellants' witnesses on these matters was inconsistent with his acts and the bulk of his writings. This court in *Dorrance's Est.*, 309 Pa. 151, disregarded a multitude of declarations in fixing domicile. One of his letters relied upon to show a change of domicile was written expressly with a view to avoid certain taxes which he subsequently paid. Appellants stress the fact that on one occasion in 1933 he considered leasing the Pittsburgh home.[1] However, this idea was not carried through and no lease was ever consummated. His stay in Florida was claimed to be due to his physical disability to return to Pittsburgh. His diary and his letters bear this out and the court below so found.

It requires less evidence to prove the continuation of domicile than it does to establish a new domicile. Pusey's domicile of origin was Pittsburgh and it is an established principle that domicile, having been shown to exist, is presumed to continue until another domicile is affirmatively proven: *Barclay's Est.*, 259 Pa. 401; *Dorrance's Est.*, supra, page 172; *Jacobs, Law of Domicile*, section 151; *Storey, Conflict of Laws*, section 55; *Beale, Conflict of Laws*, page 243. In *Price v. Price*, supra, at 626, we stated: "Domicile of origin must be presumed to continue until another sole domicile has been acquired by actual residence, coupled with the intention of abandoning the domicile of origin."[2] The court below con-

---

[1] In *Dupuy v. Wurtz*, 53 N. Y. 556, a party domiciled in New York was absent from that state for twelve years and actually leased her home in New York to another party, reserving only a room for storage. Her absence was due to illness, just as in this case, but the court held that her domicile continued in New York. See *Price v. Price*, 156 Pa. 617; *In re Reed's Will*, 48 Ore. 500; *In re Davis*, 217 F. 113; *Moorhouse v. Lord*, 10 H. L. C. 272.

[2] In *Lowry's Est.*, 6 Pa. Superior Ct. 143, affirmed on Judge PENROSE'S opinion, it was said: "A change of domicile works such important consequences, both as to status of the person and disposition of his personal estate, that the burden of proving change is upon the party alleging it, and this is so not only under settled

cluded that appellants had not successfully carried the burden of proving a change in domicile.

We will not undertake to review all the evidence relating to testamentary capacity; we note some circumstances that may have impressed the court below, as it does us. For illustration, in addition to the medical opinions, the testimony of Dr. Norton, a minister of the gospel, who made several visits to Pusey's home during the month of August and had no interest in the controversy. He had an opportunity to observe Pusey a few days before the Florida will was drafted. He testified that at that time Pusey was emaciated and worn, his arms were thrown over his head, his eyes were closed and his mouth open; he appeared in a condition resembling stupor, although indicating to Norton by a pressure of his hand that he knew he was there. Not on one occasion but on at least three separate times between August 1st and when the will was written this scene took place. Life had ebbed so far with this aged man that he was unable to make an audible greeting, much less exhibit an interest in life. It seems to us that nature could not revive this man so quickly after the last visit as to put him in condition to write a will disposing of property valued at a million and a quarter dollars, divide it into a series of bequests with life annuities founded upon a trust.

The court below may have been impressed by the fact that there were changes and omissions in the 1933 will not satisfactorily accounted for, unless it be taken as a fact that Pusey did not fully understand its provisions. To cite but one instance, the gift to the Pittsburgh Home for Incurables is not marked as a gift in memory of Mary W. Pusey in the 1933 will, as it is in the 1929 will, notwithstanding the fact that Pusey's sister had left her

principles of public law, but under the fundamental law of evidence that an established condition is presumed to continue. The presumption stands until overcome by proof and the proof must be clear and free from reasonable doubt."

property to him with the understanding that it should be devoted to this purpose. There does not seem to be any reason why on his death bed he should choose to disregard her memory. Another matter of significance is that in July of 1932 and on August 8, 1933, Pusey had the 1929 will in his possession, but without expressing any dissatisfaction, and seemingly evidencing satisfaction with it, he returned it to Pittsburgh for safe keeping.

It is argued that the court should have awarded an issue and it was in error in stating it had no power to award one. The matter is governed by the Act of June 7, 1917, P. L. 363, section 21 (a) and (b). The court had power to award an issue if it were expedient to do so. See *Cross's Est.*, 278 Pa. 170. In denying itself this power the court committed no error prejudicial to appellants. Counsel had opportunity to request that an issue be awarded if it desired one. If the court had refused an issue d. v. n., the question for us would have been limited to determining whether this was an abuse of discretion. See *Dible's Est.*, 316 Pa. 553; *In re Doster's Est.*, 271 Pa. 68; *In re Mark's Est.*, 298 Pa. 285; *In re Fink's Est.*, 310 Pa. 453.

The court was not in error in imposing upon the proponents of the 1933 will the burden of proof. Ordinarily testamentary capacity with knowledge of the dispositions made in a will and lack of undue influence are presumed, and the burden of proof is upon those who assert the contrary. But there are exceptions to that rule. When the Florida will was executed the court below found Pusey "physically helpless and moribund and his mental capacity at a low ebb." Dr. White and Miss Sullivan, as charged by appellees, and Miss McIntyre, as determined by the court, all were found to be in a confidential relation to testator. Since Pusey was mentally weak, the principle relied on by appellants in the cases of *Llewellyn's Est.*, 296 Pa. 74, 82, and *Lewis's Est.*, 210 Pa. 599, 602, does not apply, and the exception to

the rule above stated is manifest. Under these circumstances appellants had the burden of producing evidence to show full testamentary capacity and the nonexistence of undue influence. In *In re Estate of Mary Yorke,* 185 Pa. 61, 69, this court said: "Where a will is made in favor of one occupying a fiduciary relation to the testator, the burden of disproving undue influence is upon the beneficiary, whether the will was drawn by him or counsel at his procurement. . . . The rule that the burden of proof is upon the confidential adviser . . . is applied where the testimony is conflicting as to mental capacity . . . and the confidential adviser is a stranger to the testator." As stated in *Stepp v. Frampton,* 179 Pa. 284, it then became incumbent upon the parties "to show affirmatively that no deception was used, and that all was fair, open, voluntary and well understood." This principle is well established by prior cases and has been oft repeated since: see *Cuthbertson's App.,* 97 Pa. 163; *Boyd v. Boyd,* 66 Pa. 283; *Wilson v. Mitchell,* 101 Pa. 495, 505; *Yardly v. Cuthbertson,* 108 Pa. 395; *Adams's Est.,* 220 Pa. 531; and *Kane's Est.,* 312 Pa. 531. The court, therefore, was not in error in placing upon appellants the burden of proving that the Florida will was a valid will.

Appellants complain that appellees' counsel exceeded the proper limits of cross-examination. Cross-examination is a vital and essential requisite in our system of trials. As stated by Prof. Wigmore, it is probably "the greatest legal engine ever invented for the discovery of truth": *Wigmore on Evidence* (2d Ed.), section 1367. While the right is often abused, nevertheless to confine it within too narrow limits would seriously impair its effectiveness. The nature and character of the investigation, the subject under consideration, and the demeanor of the witnesses enter largely into a court's determination of the proper limits of cross-examination. A wide latitude was necessary here where a sharp contradiction existed in vital testimony, the truth of which

could only be found by a searching investigation; credibility was a prime factor. Counsel for both sides subjected the witnesses at times to a grilling and severe cross-examination. During the course of most of it no objection was made. The court below should have interfered when proper cross-examination was overstepped, but in view of the nature of the subject-matter in inquiry, and counsel having failed to object at the time, the examination, though severe, cannot here be held to be erroneous.

Did the court abuse its discretion in refusing to appoint an administrator pendente lite? The 1929 will was probated. Section 4 of the Act of June 7, 1917, P. L. 447, empowered the court to appoint such an administrator when "the circumstances of the case require." It would not aid in the determination of the matter before the court and there was no danger of loss to the estate in permitting it to remain under the control of the executors named in the will of 1929. It was a matter where proper judgment was exercised under the circumstances.

It is argued that on the appeal from the probate of the 1929 will the court should have admitted in evidence the probate decree of the Florida court together with the relevant portions of the statutes and constitution of that state and the testimony of the Florida probate judge. Appellants admit, and the cases are conclusive, that where the administration of a decedent's estate is in issue, domicile is a jurisdictional prerequisite, and where it is claimed to be in this state, or prima facie appears to be so, our courts may determine the issue of domicile: *Baker v. Baker, Eccles & Co.*, 242 U. S. 394; *Overly v. Gordon*, 177 U. S. 214; *Tilt v. Kelsey*, 207 U. S. 43, 51; *Beale, The Conflict of Laws*, page 1463; *Restatement, Conflicts*, section 470 (4). Until the question of domicile was determined, evidence relating to the Florida decree or Florida law had no relevancy and could properly be excluded under the authorities above cited. If the

court had determined that the domicile of Pusey had been in Florida the evidence would have been relevant. The court found Pusey died domiciled in Pennsylvania; these offers of evidence could not affect the determination of domicile.

Nor did the failure of the court below to admit as conclusive evidence the Florida decree violate the due process clause. In *Frick's Est.*, 277 Pa. 242, 255, we stated, "It is only when the State does not 'provide a fair opportunity for submitting the issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts,' that the conclusion reached 'is void because in conflict with the due process clause: *Ohio Valley Co. v. Ben Avon Boro.*, 260 Pa. 287, 289.'"

Decree of the court below is affirmed, at the cost of appellants.