**Kirshenbaum Estate**

*Carl Moses,* of *Moses and Bell,* for petitioner.
*Geoffrey Wosney,* for Commonwealth.

ACKER, J., March 3, 1973.—This matter came for hearing and testimony was presented on behalf of petitioner, Mark Kirshenbaum, son of decedent, Bertha Kirshenbaum, praying for the right to withdraw the estate proceedings previously filed in this case, contending that, through inadvertence, letters testamentary were taken out when petitioner was, in fact, a resident of the State of Florida. No testimony was received from the Commonwealth.

## FINDINGS OF FACT

1. Bertha Kirshenbaum died on September 23, 1972, age 66, in Miami, Fla.

2. Mrs. Kirshenbaum had lived in the City of Farrell throughout her life until the latter part of April or the first of May 1972. Her husband had predeceased her by approximately 12 years.

3. Decedent was the natural mother of a son, Mark Kirshenbaum, who resides at 5401 Beeler Avenue, Woodland Hills, Calif., and a daughter, Phyllis Peters, 9435 S. W. Fifty-third Street, Miami, Fla.

4. Thirty years previously, Bertha Kirshenbaum had been afflicted with cancer but it had been successfully abated and perhaps removed and she had no knowledge of a reoccurrence until late March or early April 1972.

5. For several months prior thereto, she had traveled to visit with her daughter, Phyllis Peters, in Florida and on to California to visit with her son, Mark, in an effort to determine where she would make her home in her declining years.

6. Although she had brothers who had moved to California and a son, her decision was in favor of residing near her daughter and the children of her daughter in Florida.

7. Her mother had by the beginning of 1972 become deceased. Her two sisters, Mrs. Lillian Zolton and Mrs. Fannie Pearlman, had informed her they also intended to leave the Farrell area but were more interested in moving to California with the remainder of the family.

8. In February of 1972, decedent called her daughter in Florida informing her that she had decided to move to Florida.

9. Because of the reoccurrence of cancer, decedent was hospitalized in the Sharon General Hospital and she elected to go to the Mayo Clinic for further treatment.

10. Both before her admittance locally to the hospital after her return from California and after her discharge, but prior to her going to the Mayo Clinic, she informed her neighbor, Mrs. Rose Ruby, whom she had known for 32 years, that she was planning to move to Florida because she wished to be near her grandchildren.

11. She also informed others during this period of her intention to move. Mrs. Ann Budno, her beauti-

cian, testified similarly as well as Mrs. Gini Nigro. Her sisters likewise confirmed the intention as expressed to them by decedent during this period to move to Florida.

12. Several of decedent's friends had moved to the south Florida area and were living within 45 minutes driving time of her. She planned to secure an apartment or a condominium. One of her closest friends, Ethel Ackerman, was in this area.

13. Decedent went to the Mayo Clinic in late March or early April and never returned to Farrell in that she traveled with her daughter, Mrs. Peters, directly to Florida.

14. On April 29, 1972, decedent placed her only real estate in Mercer County, being the homestead at 68 Shenango Boulevard, Farrell, for sale with Franek and Company, of Farrell, Pa.

15. On July 6, 1972, an agreement of sale was entered into with Mr. and Mrs. Kenneth Leonard for the purchase of the residence and most of the furniture but subject to V.A. financial approval which unfortunately was never obtained.

16. On September 18, 1972, decedent acknowledged a deed in the State of Florida for the subject property for sale to a nephew, Barry Pearlman, and his wife for the house and furniture for a purchase price of $12,000 whereas the previous asking price was $13,000.

17. Mr. and Mrs. Barry Pearlman commenced moving some of their personal effects into the residence in the week prior to the death of Mrs. Kirshenbaum but ceased doing so when they learned of her death because many of the relatives used the home during the period of the funeral and immediately thereafter.

18. Decedent was buried next to her husband in a lot that had previously been purchased and was

marked with a tombstone awaiting the death of Mrs. Kirshenbaum in Mercer County, Pa.

19. Mrs. Kirshenbaum voted in the State of Pennsylvania in 1971 but did not vote any place in 1972. No personal property tax for 1972 has been filed for and on behalf of Mrs. Kirshenbaum in Mercer County, Pa., and no Federal tax has been filed for the year of 1972 for decedent.

20. Although Mrs. Peters secured information concerning several apartments in and about the Miami area, because of the physical condition of her mother, they did not actually visit the apartments.

21. During the months from late May or early June 1972 when Mrs. Kirshenbaum traveled to Florida with her daughter and resided in her daughter's residence until her death, her condition was serious and her strength limited, although she was not fully informed of the severity of the matter and continued to plan to secure a residence of her own in the Miami area.

22. Decedent had a bank account and several deposit boxes in a local bank here in Mercer County down to the time of her death and did not attempt to change her place of banking to an institution in Florida.

23. Decedent received some mail while residing in Florida, including dividend checks and moneys from Blue Shield of Florida. She did not, however, register to vote or carry out many of the acts which normally indicate an intention to change residence and are relied upon in a case of this nature.

24. Mark Kirshenbaum, the son, applied for letters testamentary and the same were granted by the Register of Wills of Mercer County on September 29, 1972.

25. A motion for rule to show cause was presented to this court on January 5, 1973, by Mark Kirshenbaum

alleging that all of the known debts of the estate are paid and that decedent was, in fact, a resident of Miami, Fla., at the time of the death.

26. The estate has, of course, not paid the Pennsylvania State inheritance tax and that is the admitted reason for the request to withdraw the administration of the estate.

27. Mark Kirshenbaum testified that the reason for filing the letters testamentary in Mercer County was that, after consulting with a local attorney, in that he lived in California, it would be much easier to administer the estate in Pennsylvania and would require less travel and time away from home but that his mother was a resident of Miami at the time of her death.

It is the contention of the Commonwealth that because decedent last voted in Pennsylvania, never having voted in Florida, had most of her mail sent to her former residence in Pennsylvania, continued to have a Pennsylvania operator's license, continued to keep bank accounts in Pennsylvania and write checks on a Pennsylvania bank, last paid taxes in Pennsylvania and indicated a Pennsylvania address on her tax form, continued to keep her safety deposit box in a Pennsylvania bank and her valuables and securities therein, that she was buried in Pennsylvania and that her executor probated the will initially in Pennsylvania, all requires a conclusion that she did not change her residence to Florida. We disagree. In so doing, we appreciate that a heavy burden rests upon the person who alleges a change of domicile to establish not only that decedent had acquired another domicile but that he manifested and carried into execution an intention of abandoning his former domicile: Obici Estate, 373 Pa. 567, 9 A. 2d 49 (1953).

It is well established that the domicile of a person is the place where he has voluntarily fixed his habita-

tion with a present intention to make it either his permanent home or his home for an indefinite future. To effect the change of domicile, there must be a concurrence of the following factors: (1) physical presence in the place where domicile is alleged to have been acquired, and (2), an intention to make it his home without any fixed or certain purpose to return to his former place of abode: Loudenslager Will, 430 Pa. 33, 240 A. 2d 477 (1968).

As held in Commonwealth ex rel. Esenwein v. Esenwein, 348 Pa. 455, 35 A. 2d 335 (1944), page 459:

" 'The essential fact that raises a change of abode to a change of domicil is the absence of any intention to live elsewhere, Story on Conflict of Laws, §43—or, as Mr. Dicey puts it in his admirable book "the absence of any present intention of not residing permanently or indefinitely in" the new abode. Conflict of Laws, 2d ed. 111. Williamson v. Osenton, 232 U. S. 619, 624 [34 S. Ct. 442, 58 L. Ed. 758]. 'The intention required for the acquisition of domicil of choice is an intention to make a home in fact, . . .' Restatement, Conflict of Laws, section 19. Dorrance's Estate, 309 Pa. 151, 163 A. 303 [(1932)]."

All of the contentions raised by the Commonwealth are adequately answered by the controlling case of Publicker Estate, 385 Pa. 403, 123 A. 2d 655 (1956), where there is a strikingly similar factual situation as to intention to move but a failure to have the normal indicia of intent raised by the Commonwealth in the case at bar. There, the widow of a highly successful industrialist in Philadelphia died in a hospital in that city. The Orphans' Court of Montgomery County had entered a decree that decedent was a resident of that county. This was reversed on appeal in that it was concluded that decedent was, in fact, a resident of Philadelphia County. Prior to the death of decedent

and her late husband, they had resided on a 175-acre farm in Chester County. Following the husband's death in March of 1951, the wife continued to reside at the farm until December of that year when she went to Florida for her customary winter vacation. Prior to leaving, she executed a two-year lease on an apartment in the Rittenhouse-Claridge in Philadelphia. She returned from Florida in the early spring of 1952 and remained at the apartment for a short period and then from May until October of that year when she returned to Florida. When she again returned from Florida she again stayed at the Chester County farm. In the spring of 1953, she again resided in her Philadelphia apartment for a short time and then cancelled the lease and moved to Delaware County with her son where she stayed from May of 1953 until her return to Florida for the winter season in late October of 1953. Arriving back in Philadelphia in the spring of 1954, she stayed a little over a month in the Warwick Hotel and sold her home in Chester County in June of 1954. She spent a little over a month at the Warwick Hotel in Philadelphia but the remainder of the summer, with the exception of a two-week vacation in Atlantic City, was spent at the Bellevue-Stratford Hotel in Philadelphia while she looked for a home in the Main Line section of suburban Philadelphia. She finally decided upon the Thomas Wynne Apartments in Montgomery County. On September 15, 1954, she executed a one-year lease on a large apartment there. She actually occupied this apartment completely furnished with her own furniture and belongings on September 23, 1954, and resided until the end of October when she again left for Florida. She returned in March of 1955 and spent several days with her sister in Philadelphia County and then returned to her apartment in Montgomery County for approximately five days. At that

time she rented an efficiency apartment in the Ritten-house-Claridge in Philadelphia and the next day sent a letter to that apartment stating, inter alia, page 407:

"I have come to the conclusion that I would be better off locating permanently in Philadelphia. I trust, therefore, that you will do whatever you can regarding getting another tenant. I expect to leave my furniture and some personal belongings in the apartment until you advise me you have found another tenant."

On April 8, 1955, at the insistence of her doctor, she removed herself to larger quarters at the Warwick Hotel in Philadelphia where she remained from April 22 until May 9, 1955, when she entered the Mt. Sinai Hospital in Philadelphia, where she died 10 days later. The hearing judge concluded that she was a resident of Montgomery County. In doing so, the appellate court concluded that the letter of intent to abandon her Montgomery County domicile was not properly considered, nor were her declared intentions to remove herself and reside in Philadelphia. As in the instant case, there was, therefore, a specific declaration of an intention to live in a particular locality. In the case at bar, the declaration to live in Florida was made even prior to her moving there. In addition, in the case at bar the testatrix actually sold her home in Farrell, Pa., including her furniture, although her personal effects had not yet been moved to Florida. Even though in Publicker's Estate the testatrix declared that she hoped that she would not have to stay at the Warwick too long and that her reason for being there was to be near her doctor, her written declaration to the leasing agent of her intention to give up her apartment in Montgomery County did indicate an intention of permanently giving up control. Nor did it make any difference that she took up quarters temporarily in the hotel in Philadelphia until such time as she could acquire a suitable

dwelling. The fact that she did not move her furniture or personal belongings did not defeat her intent to move to Philadelphia.

The failure to change banks, register to vote, continue to have a Pennsylvania operator's license, pay taxes in Pennsylvania, write checks on a Pennsylvania bank are all factors to be considered. However, they, in themselves, are not controlling, but are merely evidences of an intention or lack thereof. It must be recognized that testatrix was in serious physical difficulties from the time that she flew from the clinic in Minnesota to her daughter's residence in Florida. Her illness was so severe that, even though the daughter did find apartments to show her mother, testatrix was not sufficiently well to view them. In addition, that said in Wallace v. Wallace, 371 Pa. 404, 89 A. 2d 769 (1952), at page 409, is particularly applicable:

"One does not move to a new domicile and immediately change church membership, bank account, operator's license and club memberships. Nor does he immediately select a neighborhood, purchase a home and buy furniture. All of those acts require varying degrees of consideration and as a consequence cannot be done hastily nor simultaneously."

Nor is this conclusion in opposition to Loudenslager Will, supra, where the testimony revealed that decedent, because of ill health and the fact that his physician was closer to his daughter's home, temporarily moved into Montgomery County, was not sufficient evidence to show a change of residence. There, however, decedent left his furniture in his Philadelphia apartment, was physically present in Montgomery County at interrupted intervals for a mere 12 days and there was insufficient evidence to show that he intended to make his daughter's home his permanent residence. It would appear that the most that decedent

said about moving to Montgomery County was that he was thinking about going up there.

Finally, we do not believe that Pusey's Estate, 321 Pa. 248, 184 Atl. 844 (1936), calls for a contrary conclusion. There, a Pittsburgh resident for several years had sojourned in Florida for the winter in a cottage which he had purchased but returned to Pittsburgh in the summers. In the fall of 1931, he again made his trip to Florida but never returned to Pittsburgh alive, having died in Florida on August 31, 1933. It was held by the appellate court that decedent's lengthy uninterrupted stay in Florida was due to his physical disability to return to Pittsburgh, and that there was no evidence that he intended to abandon his prior domicile in Pittsburgh and acquire a new domicile in Florida. Just the contrary is applicable in the case at bar, for not only did testatrix intend to reside in Florida, she did reside in Florida, fulfilling her declared intent and severing her roots by selling her family homestead in which she had resided so many years in Farrell with her husband raising her family.

As to decedent's son making application for letters of administration in this county, on initial consideration one might be constrained to conclude that, if the son makes such an election, he should be bound by it. To do so, however, is to ignore the issue before the court. Conduct of persons after the death of decedent should not in any way influence the decision of whether decedent had, in fact, established a domicile in any particular location prior to her death. Although the application for letters may have been improvident and without thorough consideration to the consequences, it should not, in any way, blur a consideration of the actual issue involved.

Wherefore, this court concludes that the rule upon the Commonwealth of Pennsylvania to show cause

why an order should not be made directing that the above-captioned estate's proceedings be closed and that the last will and testament of Bertha Kirshenbaum be withdrawn from the estate proceedings is made absolute.

### ORDER

And now, this March 23, 1973, the rule upon the Commonwealth of Pennsylvania to show cause why an order should not be made directing that the above-captioned estate's proceedings be closed and that the last will and testament of Bertha Kirshenbaum be withdrawn from the said estate proceedings and forwarded to Carl M. Moses, Esq., attorney for the estate of Bertha Kirshenbaum, is made absolute subject to the condition that the register of wills of this court shall make photocopies of the said original will and that all record costs in connection with this proceeding shall be paid by the estate of Bertha Kirshenbaum.

The register of wills shall send a copy of this opinion and order to Geoffrey Paul Wozney, Assistant Attorney General, Attention: Israel Packel, Attorney General of Pennsylvania, 1116 Frick Building, Pittsburgh, Pa., 15219, and to Carl Moses, Esq., 19 Jefferson Avenue, Sharon, Pa. 16146.