408 A.2d 1382

**In re In the Matter of J. F., a Minor.**

**Appeal of CHILDREN AND YOUTH SERVICES AGENCY OF the COUNTY OF DELAWARE.**

Supreme Court of Pennsylvania.

Submitted Oct. 11, 1979.

Decided Dec. 21, 1979.

Alfred Jason Mattei, Media, for appellant.

George A. Pagano, Media, for J. F.

Francis E. Mroz, Alexandria, Va., for natural mother.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from a decree of the Orphans' Court Division of the Court of Common Pleas of Delaware County which denied appellant Children and Youth Services Agency of Delaware County's petition to involuntarily terminate the parental rights of appellee, the natural mother of J.F. The court below also decreed that J.F., who is under the custody of the Children and Youth Services Agency, be returned to appellee. No petition for custody was before the court. No opinion was filed by the court. A Supersedeas and a stay of the proceeding pending appeal were granted by this Court.

J.F. was represented in the termination hearing by an appointed counsel who has filed a brief in this appeal approving of appellant's arguments. Asserting that the judge was biased in favor of the natural mother of J.F., appellant contends the petition to terminate parental rights was denied an impartial hearing. Further, appellant contends the judge refused to permit presentation of evidence

necessary and relevant to completion of appellant's case.[1] Findings of the Orphans' Court, if supported by competent evidence, are to be sustained unless the court abused its discretion or committed an error of law. *In re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978). Such is the extent of our scope of review where the court below has made a thorough review of the evidence. *In re: Mintz Trust*, 444 Pa. 189, 282 A.2d 295 (1971). *Pusey's Estate*, 321 Pa. 248, 184 A. 844 (1936). After careful review of the record, this Court finds the appellant was denied a fair opportunity to adequately present evidence necessary and relevant to a petition to terminate parental rights. Appellant was not afforded the thorough hearing of its case that would invoke a narrow scope of review limited to determining whether the decision below was based on competent evidence.

■ The record, excerpts from which are hereafter discussed, shows statements were made by the judge that appellant argues are indicative of bias. If a record shows that a trial judge has prejudiced a case or has shown bias or a capricious disbelief in the disposition of a case the decree based on such illegal considerations should be set aside. However, these constitute most serious charges against a judge and the record must clearly show prejudice, bias, capricious disbelief, or prejudgment. *Pusey's Estate*, Id. Many of the judge's comments criticized by appellant are susceptible to an interpretation that the judge misunderstood the grounds for termination of parental rights and became frustrated with appellant's failure to present the kind of evidence the judge erroneously believed was necessary to terminate parental rights.

■ In a case such as this, where error of law and denial of a full and impartial hearing are asserted, a detailed review of the testimony provides an understanding of the

1. Remanding this case for further proceedings, we do not address appellant's contention that evidence sufficient to warrant termination was presented below. Appellant must be allowed to complete its case, and appellee must have an opportunity to respond.

context in which statements made by the judge, and now challenged in this appeal, were made.[2]  Our examination of

2. Appellant's petition to terminate appellee's parental rights was based on abandonment for the six month statutory period, incapacity to parent, abuse, and neglect.  Adoption Act of 1970, P.L. 620, 1 P.S. § 311 (Supp.1978).  The record contains the following progression of statements by judge and counsel and significant testimony.  In the excerpts from the record appearing hereafter, counsel for the parties were: Mr. Mattei for the appellant agency, Mr. Mroz for the appellee parent, and Mr. Pagano for J.F.

Appellant's first witness, Elissa Wright, a social case worker assigned by Children and Youth Services of Delaware County to work with the F. family, testified as follows: J.F. was born in February of 1976, remained in the hospital after birth for three weeks under observation, stayed with appellee for three weeks after discharge from the hospital, was sent to live with appellee's father for six months, and then returned to stay with appellee.  In January of 1977, Miss Wright, by a visit to appellee's home, established her first contact with appellee.  During that visit, appellee stated she was interested in having J.F. placed for adoption because she was having trouble coping with being pregnant again and taking care of J.F. along with several of her other children.  Appellee placed J.F. in appellant's custody, saying she wanted him back eventually.  Other children of appellee were under foster care at that time, too.  In January of 1977, J.F. was then adjudicated a dependent child and in March of 1977 he was placed in a foster home by the appellant agency.

During the period of foster care, appellee kept twelve out of seventeen scheduled visits with J.F.  After six months of foster care, appellant returned this child to appellee's home in September of 1977.  J.F. was not thereafter as active as he had been while in foster care and appellee complained about J.F.'s behavior and small and weak physical condition: appellant recommended that the child be taken to a doctor but appellee did not promptly comply.  After J.F. was returned to appellee in September of 1977, the appellant agency maintained scheduled visits to check up on the child, help appellee find different housing, and set up homemaker services.  Appellee's paramour (who was not the father of J.F.) objected to these visits and early in October of 1977 said he would kill Miss Wright if she ever returned.  Later in October, in response to a report of suspected child abuse, Miss Wright, went to appellee's house to check on J.F.'s condition but was prevented from seeing him for a period of one and a half hours while appellee's paramour made phone calls because appellee wanted to confer with her attorney.  Then, when Miss Wright saw J.F., she observed bruises on numerous areas of his body and, accompanied by appellee, took J.F. to a hospital.  Consequently, for two weeks until November 8, 1977, the child was hospitalized for treatment.  During this hospitalization, a hearing on suspected child abuse was held and J.F. was adjudicated dependent.  Shortly after Miss Wright testified that the child abuse hearing had been held, the judge *repeatedly* asked appellant's counsel whether appellant wanted to have J.F. taken away from J.F.'s mother by a termination proceed-

the record indicates that the proceeding below was pervaded by actions of the judge reflecting: 1) a disregard of the evidence presented by the appellant agency and a failure to

ing, and after affirmative replies were given, the judge said he wanted to hear testimony about appellee's living conditions at present. The following statement was made, after which the judge asked two *more* times whether appellant wanted to take the child from its mother:

THE COURT: That is what I am interested in hearing about. We know where the child has been, I am interested in finding out where this child is going to be going.

*These seem like good people.* (Emphasis added) (N.T. 32)

During cross-examination by appellee's counsel, Miss Wright testified to the following additional matters: Appellee had cooperated with some of the appellant agency's programs and had complied with a suggestion that she move to more spacious quarters for J.F.'s benefit at the end of his first foster care period. Miss Wright did not see bruises being inflicted upon J.F., but was told by appellee that the paramour had struck J.F. and the other children too hard. Miss Wright was also told by appellee that the child had fallen out of a crib. Appellee visited J.F. three times while he was in the hospital. Approximately five days after the November 23, 1977 child abuse hearing that was held while J.F. was in the hospital, appellee, along with her other children and paramour, moved to Virginia.

During cross-examination by counsel for J.F., Miss Wright testified that despite requests made to appellee to return from Virginia to visit J.F., and notwithstanding a court order that appellee visit and be allowed a fee for coming, appellee has *never* visited J.F. (Note: The order contained a provision that "the F.'s will agree to come to Delaware County at least once per month to visit with J.F., and that Child Care Services will pay the sum of forty-five dollars toward the transportation costs for said visit;")

Appellant agency's next witness was Dr. Lehmicke, a pediatrician, who testified to the following: Dr. Lehmicke examined J.F. several times during the first term of foster care and at the very start of that period, in January of 1977, J.F. was healthy, on the whole, but showed signs of a diseased development—a condition which improved during foster care. After foster care ended and J.F. returned to live with appellee, J.F. lost weight and seemed weak. While J.F. was in the hospital in late October and early November of 1977, following the suspected abuse incident, Dr. Lehmicke examined J.F. and noted *severe lacerations, abrasions and contusions all over J.F.'s body.* Dr. Lehmicke gave his opinion that such severe injuries could not have been caused by falling from a crib. Dr. Lehmicke, not believing appellee's assertion in the emergency room that J.F. fell out of a crib, filed a suspected child abuse report. In reference to that report the following exchange occurred:

BY THE COURT:

Q Was there an opinion by any medical doctor at this hospital as to the cause of these bruises?

A It is in the report, a suspected abuse.

see the relevance of evidence of abuse, neglect, incapacity to
parent, and abandonment to grounds for termination of
parental rights; 2) exclusion of evidence, not apparently

Q   Who signed that?
A   Dr. Terrence.
Q   *Because* Dr. Terrence and *you say* there was a suspected abuse,
*that is the reason* this child was abused?
A   Yes, a possible abuse case.  We suspected that this child had
been physically abused.  This is not a normal type of injury that
you would find from falling out of a crib or running around the
house or something of that type.  These were not the ordinary
types of marks that a child would get running or playing.
THE COURT:   Before you say anything, Mr. Mroz, I am going to
say something.  *What are we doing* here, Mr. Mattei?
MR. MATTEI:   Your Honor, would you *please permit us to finish
our case* ?
THE COURT:   *You are talking about abuse.*  You are making all
sorts of charges in this hearing.  Present your case, sir.  (Emphasis
added)  (N.T. 63–64)

.     .     .     .     .

THE COURT:   All I am hearing now are charges of abuse, some-
body thinks that somebody might have been abused.  I need
something more solid than that.  Do you have any other evidence
to present?
MR. MATTEI:   Yes, your Honor, *we have further evidence* to
present.
THE COURT:   *I don't like* charges of abuse being thrown around
in my courtroom.  *You have to show me that these parents want
nothing to do with that child.*  (Emphasis added)  (N.T. 64–65)
Direct examination of Dr. Lehmicke concluded with his testimony
that he was experienced in dealing with approximately twelve other
child abuse cases and that *in his opinion J.F. had been abused.*
Then, during cross-examination of Dr. Lehmicke, the record contains
the following:
THE COURT:   I have a question for you.  What kind of proof do
you have that there was an abuse in this case?
MR. MATTEI:   Your Honor, the doctor has testified that in his
opinion there was an abuse.
MR. MATTEI:   Your Honor, this is a hearing to terminate the
parental rights.  We are *prepared to put on testimony* that *this
woman is not responsible to take care* of this child.  *We are
putting on testimony that this child has been abused.*  The doctor
has so testified.
THE COURT:   Yes, *that is your opinion.*  You are trying your own
case aren't you?  .   .   .  (Emphasis added)  (N.T. 73–74)

.     .     .     .     .

THE COURT:   I have to deal in concrete evidence, not innuendo.
MR. PAGANO:   Your Honor, there has been a history of neglect in
this case, from the day that this child was born, he has been in and
out of foster homes.  He was taken to the emergency room of a
hospital for examination.  After he is examined, there is a suspect-

repetitive, etc., which would be relevant to grounds asserted for terminating parental rights; and 3) a correct understanding that the petitioner for termination has the burden

> ed abuse report filed. The child is in the hospital for two weeks and then the parents leave the jurisdiction.
> THE COURT: *I didn't hear that type of testimony here today.* (Emphasis added)  (N.T. 75–76)

> MR. PAGANO:  Your Honor, this child had bruises all over his body.
> THE COURT:  That doesn't necessarily mean that someone is guilty of *abusing this child as of this moment.*  (Emphasis added) (N.T. 76–77)

> THE COURT:  You want me to take this child away from his mother.  *I have seen how your agency has operated in the past.* (Emphasis added)  (N.T. 77)

> BY THE COURT:
> Q  Did you *see* her beating this child?
> A  No, I did not.
> Q  Did the mother *tell you* that she abused this child?
> A  No she did not.  (N.T. 77–78)

(In reviewing the record, we recognize that certainly there is no requirement that a doctor, in order to file an abuse report, has seen a beating occur.  Because of the nature of these situations, rarely would parents who abuse children admit such abuse.)

Dr. Lehmicke concluded his testimony by saying J.F.'s failure to advance after returning to appellee's home after being in foster care should not have been expected, that shifting the child between foster care and appellee's home hindered J.F.'s opportunity to develop family relationships, and that J.F. regained weight when he was placed back in foster care after the incident that resulted in his hospitalization.  As soon as cross-examination was complete, the judge and counsel engaged in the following exchange:

> THE COURT:  Does counsel for the agency have any further witnesses that he'd like to put on the stand?  Do you have *anything* that you can show me?
> MR. MATTEI:  Yes, Your Honor, we *have many witnesses* to present.
> THE COURT:  The burden is on you, Mr. Mattei, it is not shifting towards the parents.  You must prove them unfit.
> MR. MATTEI:  Yes, Your Honor, we are aware of that and we are prepared to do so.
> MR. MROZ:  Your Honor, I would like to ask for an offer of proof as to his next witness.
> THE COURT:  I think you are entitled to that.
> MR. MATTEI:  Your Honor, I don't—we can present our case in the way that we see fit to present it.  I *have witnesses here that will testify as to the conditions in Virginia*, where Mrs. F. and Mr. R. are residing.

of proof, but an erroneous belief that a petitioner must show a parent is presently abusing the child or wants nothing to do with the child at the time of the termination hearing. It

> For the Court's information, they have been residing down there since the end of November or beginning of December of 1977, and have not come back since.
> There have been visitation schedules set up, and these have not been adhered to. Children and Youth Services was ordered to pay a set amount for each visitation to afford Mrs. F. transportation to and from the visitations, these were all rejected. Visitations have been set up and ignored. They haven't seen the child for over a year, and now they decide is the time to come to Court. (Emphasis added) (N.T. 87–88)

> .    .    .    .    .

> MR. MATTEI: Your Honor, I feel that I must place on the record the fact that when I was speaking to Your Honor at side bar, *you were telling me to try to convince you would be like trying to break through a stone wall.*
> THE COURT: *Yes,* I said that. You must convince me that there is *good reason* for me to take this child away from his parents.
> MR. MATTEI: Your Honor, if you will excuse me, *you said that you know how this agency operates, and you're not going to let it happen.*
> THE COURT: What I told you, Mr. Mattei, is that I need a justifiable reason to take this child away from his people. *I don't see any reason*—you haven't shown me good cause.
> MR. MATTEI: Your Honor, *you said that you know how these people operate* —
> THE COURT: *Yes, I did and I will say it again.* There has been no testimony that would warrant me taking this child away from his mother. You claim that there has been *neglect.* Obviously, this mother is *concerned or she wouldn't be here* this afternoon with her attorney to protest this petition that was filed by your agency. *I have heard* no testimony that she has neglected her child.
> MR. MATTEI: Your Honor, *there will be testimony* presented that she hasn't seen him in over a year. (Emphasis added) (N.T. 88–90)

> Then, without there having been *any* testimony as to the reasons for appellee's move to Virginia or for her failure to maintain contact with J.F., the following statements were made:
> THE COURT: She is doing the best that she can, they moved down to Virginia and she obviously *cares* for her son *or she would not be here today.* That is what I mean.
> *If she had neglected* her son, *she would not have come* all the way from Virginia to be in this hearing today. We don't have a bad family here. (Emphasis added) (N.T. 90)

> .    .    .    .    .

> THE COURT: You are trying to tell me that she is not interested. If she is not interested, she *would not be here today.* (Emphasis added) (N.T. 92)

124

is well established that once the six month statutory period of abandonment has passed, mere renewal of interest and

> MR. PAGANO: Your Honor, this mother has abandoned her child in the State of Pennsylvania. There were visitations set up and she ignored them. There were efforts at establishing contact, but she ignored her child.
>
> She not only left him here in Pennsylvania, she went down to Virginia and ignored him. She went down there and forgot about him.
>
> THE COURT: Well, *if she forgot about him,* she *most certainly remembered him today.* (Emphasis added) (N.T. 93)

Mr. Mattei then told the court *several* times that much more testimony was yet to be presented, but the following discussions occurred:

> THE COURT: I will tell you what my position is and I will tell you now. I fell that this child should be returned to his family and that the involvement of Child Care should be withdrawn.
>
> I am not going to permit this agency to take this child from his mother.
>
> She loves her child. If she didn't, she *wouldn't be here today.* (Emphasis added) (N.T. 95)

> MR. PAGANO: Your Honor, she never even telephoned him. Before he went into the hospital, there was talk that she was wanting to put him up for adoption.
>
> THE COURT: Well obviously she has *changed her mind, now.* Wouldn't you think so?
>
> MR. MATTEI: Your Honor, I think that I personally have never seen such a clear cut case for termination, sir.
>
> THE COURT: We obviously have a difference of opinion, Mr. Mattei.
>
> We are going to let her have the child. We are going to let her have a *second chance.* She must feel that she wants this child, or she *wouldn't have come* up here for this court hearing.
>
> MR. PAGANO: Then why didn't she come up here to visit her son.
>
> THE COURT: *Maybe she has changed her ways. As long as I see her sitting there, I am not going to take her son away from her forever.* (Emphasis added) (N.T. 97–98)

> MR. PAGANO: Your, Honor, you just can't let this happen. She abandoned this child thirteen months ago.
>
> THE COURT: Well she's *back here willing to take care of him, now,* isn't she? (Emphasis added) (N.T. 99)

Mr. Mattei concluded with one final request that he be permitted to present more witnesses, but the judge immediately dismissed the petition for termination of parental rights and decreed that the child be removed from the custody of Children and Youth Services and returned to appellee although no petition for custody was before the court.

expression of desire for the return of a discarded child do not negate the abandonment. *Matter of Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978).

■ Hence, we vacate the decree below and remand for further hearings on grounds that 1) an erroneous legal standard was applied below, and 2) the parties were not given the full hearing due them. Furthermore, transfer of custody was not an issue properly before the court. Finally, we believe the trial judge's aforementioned behavior precludes his further participation in this case.

Decree vacated and case remanded for proceedings consistent with this opinion.

Each party to pay own costs.

MANDERINO, J., did not participate in the decision in this case.

NIX, J., concurs in the result.