Obici Estate.

568

Argued April 21, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*David Berger*, with him *Leon H. Kline, Frank Lenahan* and *Jacob Schiffman*, for appellant.

*Bernard G. Segal*, with him *Edward W. Mullinix, Matthew D. Mackie, William A. Schnader, Schnader, Harrison, Segal & Lewis* and *Andrew Hourigan, Jr.*, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, May 25, 1953:

This appeal is from a decree of the Orphans' Court of Luzerne County dismissing appeal of Harry J. Musante, from the decree of the register of wills, revoking letters of administration issued to him as administrator of the estate of Louise Musante Obici, deceased. The question is whether or not the intestate had a "family or principal residence" in Luzerne County, within the meaning of sec. 2 (a) of the Fiduciaries Act of June 7, 1917 P. L. 447, as amended, 20 PS §341. The register and on appeal the orphans' court decided that she did not and decreed revocation of the letters which appellant had secured upon his *ex parte* applica-

tion, after citation to intestate's next of kin.

Louise Musante Obici, the intestate, was the wife of Amedeo Obici. She died August 29, 1938, in the City of Wilkes-Barre, Pennsylvania. She left to survive her, as her only heirs and next of kin, her husband, Amedeo Obici, three sisters, one nephew (appellant) and a niece. Appellant in his petition for letters dated December 3, 1947, nine years after intestate's death, averred that she was a resident of the City of Wilkes-Barre and was possessed of personal property to the value of $500. Letters of administration were granted to appellant the same day.

Amedeo Obici, the surviving husband, died testate on May 21, 1947 (nine years after the death of his wife), domiciled in Suffolk County, Virginia. Letters testamentary were granted to the executors named in his will who are the appellees.

On February 4, 1948, on petition of appellees, a citation was awarded to appellant to show cause why the letters of administration issued to appellant by the register of wills should not be revoked. It was alleged that intestate was domiciled in Virginia and not in Pennsylvania, at the time of her decease, and that she possessed no property in Pennsylvania. An answer in denial was filed by appellant and issue was joined. Upon a hearing by the register of wills, he decided that intestate at date of her death was not domiciled in Pennsylvania, but was domiciled in the State of Virginia. The register revoked the letters of administration. On appeal to the Orphans' Court of Luzerne County, appellant's appeal was dismissed. An appeal to this Court then followed.

It was stated by counsel that under the law of the State of Virginia, the husband's share of the estate of this intestate (who left no issue surviving) would be the whole thereof. Should such intestate be domiciled

in Pennsylvania, the surviving husband would be entitled to a one half portion of her estate and the remaining half would pass to her next of kin (above named).

It was not shown that intestate possessed any real or personal property in Pennsylvania. No inventory has been filed and no transfer inheritance tax has been assessed or paid on her estate since her death in 1938.

It is true, as urged by appellant, that an erroneous principle of law which is made the basis of a decision determining the appointment of the administrator is not binding upon the court in a subsequent proceeding in the estate in connection with the wholly distinct subject of distribution: *Reamer's Estate,* 331 Pa. 117, 121, 122, 200 A. 35; *Boytor's Estate,* 130 Pa. Superior Ct. 591, 198 A. 484; *Serrel Estate,* 69 D. & C. 69, 73. However, if in truth the State of Virginia was the legal domicile of intestate, the Pennsylvania next of kin possess no status as interested parties, entitling them to intermeddle in the settlement or distribution of intestate's estate. It therefore is imperative for the Court to determine the true domicile of intestate at the date of her death.

The Act of 1917, June 7, P. L. 447, sec. 2 (a), 20 PS §341, provides that letters testamentary and of administration shall be grantable only by the register of wills of the county within which was *"the family or principal residence of the decedent at the time of his decease."* (emphasis supplied) The word "residence" used both in this act (Fiduciaries Act) and sec. 4 of the Register of Wills Act of June 7, 1917, P. L. 415, 20 PS 1862, has been construed in courts below to mean " 'domicile as opposed to temporary residence' ": *Burke Estate,* 75 D. & C. 303, and cases therein cited. We agree with the construction: *Carey's Appeal,* 75 Pa. 201; *Hindman's Appeal,* 85 Pa. 466; *Barclay's Estate,* 259 Pa. 401, 103 A. 274; *Dorrance's Estate,* 309 Pa. 151,

163 A. 303; *Pusey's Estate,* 321 Pa. 248, 184 A. 844; *Smith v. Smith,* 364 Pa. 1, 70 A. 2d 630, p. 4.

In *Hindman's Appeal,* supra, we said, p. 470, quoting from a Massachusetts case: ". . . 'it depends not upon proving particular facts, but whether all the facts and circumstances taken together, tending to show that a man has his home or domicile in one place overbalance all the like proofs, tending to establish it in another.' "

In *Dorrance's Estate,* supra, p. 170: "In holding that a domicile of choice may not be retained by intention alone, we do not mean to disturb the well settled rule that absence from a place of legal residence, for purposes of health or other unavoidable necessity, will not result in a loss of that domicile . . . Nor do we mean that where a man has two actual residences, either one of which might be his domicile, he is not free to choose between them. . . ."

We also said in *Pusey's Estate,* supra, p. 265: "It requires less evidence to prove the continuation of domicile than it does to establish a new domicile. Pusey's domicile of origin was Pittsburgh and it is an established principle that domicile, having been shown to exist, is presumed to continue until another domicile is affirmatively proven: . . . The court below concluded that appellants had not successfully carried the burden of proving a change in domicile."

An excellent statement concerning the quality and weight of evidence necessary to establish a *change* of domicile was made by the eminent Philadelphia Orphans' Court Judge, CLEMENT B. PENROSE, whose opinion is quoted at length in the official report of the Superior Court in *Lowry's Estate,* 6 Pa. Superior Ct. 143. It reads in part as follows (p. 148): "A change of domicil works such important consequences, both as to the status of the person and the distribution of his personal estate, that the burden of proving a change is

upon the party alleging it, and this is not only under settled principles of public law, but *under the fundamental rule of evidence that an established condition is presumed to continue. The presumption stands until overcome by proof and the proof must be clear and free from reasonable doubt.* Mere residence in a foreign country is not, standing by itself, enough. It must appear that the residence was *animo manendi,* and with the intention of abandoning the former domicil. An established domicil adheres until an intention to adopt, with an actual adoption of a new one is made manifest, . . ." (italics supplied).

*Lowry's Estate,* supra, related to *domicile of origin;* i.e., one acquired at birth. But there appears to be small difference in principle in the required proof of an effective change in domicile in the case of *domicile of choice,* especially one relating to a long established marital domicile. A heavy burden rests upon him who alleges a change in domicile to establish not only that decedent had acquired another domicile but that he *manifested and carried into execution an intention of abandoning his former domicile.* Such change must be *"animo et facto"*: *Lowry's Estate,* supra; *Price v. Price,* 156 Pa. 617, 27 A. 291. Where a "domicile of choice" is once established, such domicile continues *until it is superseded by a new domicile*: Restatement, Conflict of Laws, §23. The comment to this section reads: "Every person must have a domicil even though he has no home (see §11). Therefore, when a home is abandoned, the domicil continues until a new domicil is acquired." Sec. 11, supra, states that a person may have but one domicile. Illustration 2 to the comment on this section states: "A has two homes, the law determines which of them is his domicil."

As the findings of fact of the register of wills in his opinion revoking letters of administration of appellant

are so full and complete, as is also the recital of facts in the opinion of the orphans' court affirming the register's opinion, it would be unnecessarily repetitious to state again, in detail, what has been so comprehensively recited in the opinion of the register of wills and in the court below. We shall therefore merely state the principal facts in general outline.

The husband and wife, then residents of the City of Wilkes-Barre, were married in 1916. From the time of their marriage until January, 1937—a period of twenty-one years—they resided together as husband and wife in the State of Virginia. In 1937 the wife came to Wilkes-Barre to her sister's home where she remained until her death in August, 1938—a period of nineteen months. What the intestate *did* during that period, and what she *said,* considered in the light of the surrounding circumstances, constitute the crux of this inquiry.

It will suffice to state that during the period of marital domicile in Virginia the husband's business assumed vast proportions. He became eminently successful and wealthy. The husband and wife maintained an elaborate estate, lived in a luxurious manner, with servants, chauffeurs, automobiles, yachts, swimming pool, etc. They entertained lavishly. The husband's business required numerous journeys to the West Coast, Canada, and even abroad. There were no children born of the union. The wife's relatives were the chief visitors at their home. There was testimony that the wife was lonely in this vast estate when her husband was away on the above trips—one of which was in Italy where he donated and endowed a hospital wing in memory of his deceased mother. Beyond slight marital differences, there appears to have been no serious rift in the domestic relations of the couple. In 1935 the wife became ill, and in 1936 was stricken with an at-

tack of hypertension.  Mrs. Mae Stillman, her sister, remained with her in the home in Virginia until 1937.

After intestate's apparent recovery the parties and others in January, 1937, visited Washington, D. C., attending the inauguration of President Roosevelt and remained there until January 20, 1937.  The wife with her sisters went to Wilkes-Barre—staying at the home of her sister, Mrs. Santucci—where she remained for nineteen months, until August 29, 1938, when she died.

The court below said: ". . . [on] February 4, 1937, . . . Mrs. Obici suffered a recurrent attack of paroxysmal hypertension. Mr. Obici immediately returned from Suffolk, Virginia to attend his wife and secure her proper care.

"From the aforefound time until her death on August 29, 1938, she was under the constant care of doctors, particularly Dr. A. L. Luchi, of Wilkes-Barre, and she required constant nursing attendance.  Following recovery from the first attack of illness, she suffered a second attack from the 15th of May to the 19th of May, 1937; then followed a third attack from the 20th of August to the 23rd of August, 1937; a fourth attack occurred from the 22nd to the 25th of October, 1937. Her physical and mental condition, due to the recurrent attacks, gradually deteriorated, and from the latter part of the following November until her death she never left the sick room.  In the period from November, 1937 to July 20, 1938, the patient received 22 blood transfusions.  A reaction from the hypodermic injections caused an inflammation of her right arm, which required hot applications, and after the arm was opened and drained in April, of 1938, it required constant care until her death.  She suffered an attack of coronary thrombosis on the 22nd of July, 1938.  Death followed on August 29, 1938, due to the aforefound complications, at the age of 74."

There was considerable testimony, chiefly from sisters, nephew and niece of intestate, that intestate had stated that she had separated from her husband and intended to make her permanent home and domicile with her sister, Mrs. Santucci, in Wilkes-Barre. But summarized by the orphans' court, it is stated: "Throughout the illness of his wife, Mr. Obici kept in constant contact, by telephone and/or mail, with the doctor, the nurse and his wife. His business affairs necessitated an extended trip to San Francisco during the yearly period of his wife's illness. From the latter part of July, 1937 until the middle of September, 1937, he was in Italy to attend a dedication of a hospital wing in memory of his mother, and while there he received treatment for a leg ailment. These extended trips apparently were made by Mr. Obici after assurance from his wife's attending physician that her condition should not prevent his going. Correspondence between Mr. Obici and the attending physician reflected Mr. Obici's concern as to his wife's welfare. His letters to his wife were anticipated and welcomed by her; messages from his wife to him through the nurse, reflected her feeling of affection and regard. The record does not show whether or not Mrs. Obici was able to write. During periods other than those covered by the extended trips, Mr. Obici made bi-weekly visits to his wife, coming up from Suffolk, Virginia. During these visits he stayed at his sister's home near Wilkes-Barre. When his wife's condition became grave, he stayed at a hotel in Wilkes-Barre. Apparently, due to the confinement of his wife and her required attendants, there was no room in the Santucci home to accommodate Mr. Obici, although it appears he stayed for dinner in the Santucci home on many of his visits.

"Throughout the twenty-odd years of their married life, there appears no course of conduct to cause or

justify any estrangement or separation. The separation of Mr. and Mrs. Obici over the period of the latter's illness did not come about through a voluntary acquiescence by either spouse, but was caused by the long sickness of Mrs. Obici and the necessitated absences of Mr. Obici due to business affairs."

There is ample testimony to support the findings of the register and of the orphans' court that the domicile of the intestate was the State of Virginia and not Pennsylvania. Such findings will not therefore be disturbed: *Teats v. Anderson,* 358 Pa. 523, 58 A. 2d 31; *Harbison Estate,* 365 Pa. 468, 76 A. 2d 187.

It is true as we said in *Dorrance's Estate,* 309 Pa. 151, 163 A. 303, p. 156: "The determination of decedent's domicile in this appeal is a conclusion of law, based upon facts, most of which are undisputed. Furthermore, this case falls within the rule stated in Hindman's App., 85 Pa. 466, 470, that where a finding of fact is simply a deduction from other facts reported by the tribunal under review, and the ultimate fact in question is purely the result of reasoning, we are competent to judge of its correctness and will draw our own conclusions from the facts as reported." We have carefully reviewed all the testimony and our own conclusions coincide with those of the register and the court below.

The circumstances under which the wife, for nineteen months, lived apart from her husband did not establish desertion or even suggest a consensual separation. It is stated in Restatement, Conflict of Laws, §27: "Except as stated in §28, a wife has the same domicil as that of her husband." Sec. 28 reads: "If a wife lives apart from her husband, . . . she can have a separate domicil." But in the facts of this case the mental and physical illness of the wife, when coupled with the testimony of the sisters, nephew and niece,

did not establish the erection of a separate domicile of the wife in Pennsylvania.

It is stated by counsel for both parties, either at argument or in their paper books, matters which do not appear in the printed record:

(a) that the real purpose for seeking the appointment of the administrator in Pennsylvania is to seek to establish the existence of an oral partnership agreement between the husband and wife—made allegedly many years ago—relating to the vast and extremely lucrative business ostensibly conducted by the husband in his lifetime; that pending this litigation, and after the letters of administration had been revoked, appellant instituted an action in the federal court (on diversity of citizenship) seeking to have a partnership decreed and for an accounting.

(b) that the personal counsel for the register at times conducted some of the hearings, ruled upon credibility of witnesses, etc., and that this constituted an improper delegation of authority.

Since neither of these matters was presented to the court below, we express no opinion concerning them.

The orphans' court was not required to call witnesses since, by written agreement of counsel for all parties dated December 6, 1951, filed of record, it was stipulated that on appeal to the orphans' court from the decision of the register "the parties will not introduce any new evidence. . .".

All remaining objections to the decree of the orphans' court are obviously without merit and do not warrant discussion.

The decree of the orphans' court is affirmed, at the cost of appellant.