**Perelman, Appeal from Register**

*Andrew C. Eckert,* for petitioner

HERRON, *J.,* July 24, 2013—

## Introduction

The issue of Ruth Perelman's domicile at the time of her death has been raised by the appeal of her husband, Raymond Perelman, from a decree of the Philadelphia Register of Wills that admitted into probate a July 28, 2010 will "that effectively" removed her husband as beneficiary of her residuary estate."[1] Raymond Perelman

---

1. 10/16/12 Raymond Perelman (hereinafter "Raymond") petition,

("Raymond") is challenging the jurisdiction of this court by asserting that his wife Ruth was a domiciliary of Palm Beach County, Florida, at the time of her death. The Perelmans' son, Jeffrey, takes the contrary position. Jeffrey argues that Ruth's domicile was in Philadelphia, Pennsylvania. A hearing was held on this issue, and both sides filed thorough post-trial briefs. For the reasons set forth below, based on controlling precedent and facts of record, this court finds that Ruth Perelman was a domiciliary of Philadelphia, Pennsylvania at the time of her death.

## Factual Background

Ruth Perelman died on July 31, 2011 in Philadelphia, Pennsylvania. She was ninety years old and had been married to Raymond Perelman for seventy years. She was buried in Philadelphia in a mausoleum with Raymond's father, mother, sister and brother.[2]

The Perelmans had two sons: Ronald, who lives in New York, and Jeffrey, who lives in the Philadelphia suburbs. Throughout their marriage, the Perelmans maintained a residence in Pennsylvania. From 1950 to 1970, they resided in Elkins Park, a Philadelphia suburb, where Raymond played a key role in building a synagogue designed by Frank Lloyd Wright, the Beth Shalom, and then served

---

¶24. This petition also claimed that Ruth's will effectively removed her husband as a beneficiary of her tangible personal property.

2. 3/19/13 N.T. at 37 & 67-68 (Raymond). A dispute arose as to Ruth's address for her death certificate. When Raymond was the informant, the address was listed at Palm Beach. An amended death certificate with Jeffrey Perelman as the informant listed Ruth's address as 1820 Rittenhouse Square. 3/19/13 N.T. at 37-38; exs. P-18 & P-19.

as a board member. Both sons made their Bar Mitzvahs in that congregation.[3] In 1970, the Perelmans moved to a spacious 6,200 foot penthouse residence perched on the top of a building Raymond built on Rittenhouse Square. Raymond conceded that this is a preeminent address in Philadelphia which he picked by design.[4] Ruth resided there until the day of her death. In the 1950's she had been diagnosed with chronic lymphocytic leukemia (CLL) but she was never informed of this diagnosis due to the wishes of her husband and sons, all of whom believed that Ruth's awareness of this diagnosis would have had deleterious health consequences.[5]

Raymond was a highly successful businessman, who throughout his lifetime continued to work in the offices he maintained on the outskirts of Philadelphia in Bala Cynwd.

All of his "outside" professionals such as lawyers and accountants live in the greater Philadelphia area.[6] Ruth and Raymond were also extraordinarily generous philanthropists. Between 1997 to 2009, the Perelmans contributed $74,697,109 to various charities, with 94.8% of those contributions to charities located in Pennsylvania, while 1.1% of the contributions went to charities located in Florida. In addition, Raymond has pledged a $225 million contribution to the University of Pennsylvania medical

---

3. 3/19/13 N.T. at 30-31, 62 & 66-67 (Raymond Perelman hereinafter "Raymond"); 3/19/13 N.T. at 252 (Jeffrey Perelman).
4. 3/19/13 N.T. at 58-59, 16-17 (Raymond)("I built the apartment. I took the top floor and sold the rest of them underneath"). *Id.* at 59.
5. 3/19/13 N.T. at 32 (Raymond).
6. 3/19/13 N.T. at 82-85 (Raymond).

center which will be named after both him and Ruth.[7]

By 1990, the Perelmans also had a home in New Jersey. Around 1992, the Perelmans bought property in Palm Beach at 965 North Ocean Boulevard, which Raymond estimated was 6000 to 7000 square feet.[8] In 1996, both Raymond and Ruth applied for the Florida homestead exemption. Ruth obtained a Florida driver's license, which she subsequently turned in to obtain a Florida identification card in 2001. Ruth voted fifteen times in Florida; her last vote in 2010 was by absentee ballot. When Raymond filed the 1040 tax form, he listed the Florida address.[9] The Perelmans did not, however, join a synagogue in Florida "because we were members of the synagogue here (Philadelphia suburb) which I helped build so I felt a loyalty to it and I remained a member of the Philadelphia synagogue."[10]

Raymond testified that each year, he and Ruth would travel to Florida, and they "made sure we spent six months and our six months ran from November 1st through May 1st."[11] In his mind, the law required a person to stay in Florida six months to qualify as a resident, and he did so for tax reasons because "[w]ouldn't it be stupid not to?"[12] According to Raymond, Ruth relied on him for the

---

7. Ex. R-10; 3/19/13 N.T. at 76-78 (Raymond).
8. 3/19/13 N.T. at 14-15 (Raymond); ex. P-20 (deed).
9. Exs. P-1; P-5; P-7; P-29; 3/19/13 N.T. at 17-29 (Raymond).
10. 3/19/13 N.T. at 30 (Raymond).
11. 3/19/13 N.T. at 17 (Raymond). Their friend, Florence Marcus, testified in her deposition that the Perelmans always returned home to Philadelphia by April 15th for Ruth's birthday. Ex. R-36 at 50.
12. 3/19/13 N.T. at 57 & 56 (Raymond).

accuracy of their tax forms.[13] Raymond conceded that Ruth never discussed with him whether to make Florida their permanent home; rather, they just "did it."[14]

On April 30, 2009, Ruth broke her hip while in Philadelphia. She never returned to Florida.[15] As Raymond noted, Ruth's physicians were all in Philadelphia and since he was on the board of trustees of the hospital, she knew she would get special care. In particular, Ruth's internist, Dr. Crooks, was extremely responsive and made frequent house calls. He saw Ruth as often as three times a week.[16] Dr. Crooks began treating Ruth in the early 1990's and remained her primary physician until her death on July 31, 2011. He deferred to her family's instructions and never told her that she had CLL, which she lived with for over 50 years. As the chronic condition progressed, it became increasingly difficult for him to treat Ruth, who grew increasingly dependent upon him. From 2009 to the spring of 2010, Dr. Crooks believed it was acceptable for Ruth to travel by plane or helicopter. By the spring of 2010, Ruth became more disabled by the CLL, developing heart disease and diabetes. In March 2010, she developed pleural effusion and was hospitalized. A chest tube was inserted and then removed. In November 2010, however, the chest tube was reinserted permanently.[17]

Ruth never worked outside the home and her family was

---

13. 3/19/13 N.T. at 92 (Raymond).
14. 3/19/13 N.T. at 63 (Raymond).
15. 3/19/13 N.T. at 33 (Raymond); ex. R-21-3. Ruth was admitted to Pennsylvania Hospital on April 30, 2009 and discharged on May 6, 2009 for home physical and occupational therapy.
16. 3/19/13 N.T. at 33-34 (Raymond).
17. 3/21/13 N.T. at 15-16, 21, 24-28 (Dr. Crooks): ex. R-21-29.

extremely important to her. Both her husband and friends praised her as a devoted, loving mother and grandmother.[18] The last years of her life, however, were filled with stress and anxiety over lawsuits that her husband Raymond and son Jeffrey filed against each other.[19] In October 2009, Raymond filed a lawsuit against Jeffrey, asserting, inter alia, that he had breached their agreement in the transfer of business interests 20 years ago by failing to create a trust that would adequately benefit Jeffrey's daughter Alison while excluding any interest to Jeffrey's wife, Marsha.[20] Shortly thereafter, an amended complaint was filed that joined Ruth as a plaintiff in Raymond's suit against his son. Ex. R-46. Ruth acted quickly to remove herself from this litigation. She contacted attorney Marvin Lundy who wrote to Raymond's attorney that "Ruth is also adamant that she has not retained you or any other member of your firm to represent her in any litigation whatsoever, especially against Jeffrey" and Ruth wished "that you withdraw the complaint which was filed against Jeffrey." Ex. R-47. In mid-November 2009, the motion to amend the complaint to include Ruth as plaintiff against her son was withdrawn. Ex.R-52

On August 18, 2009, Raymond changed his will to remove Ruth as his personal fiduciary, replacing her with

---

18. 3/19/13 N.T. at 38 (Raymond)(Ruth was a "fabulous wife, a wonderful mother, a wonderful grandmother"); ex. R-36 at 45 (Florence Marcus)(Ruth "was a wonderful mother and a caring mother").

19. Ruth's closed friend Florence Marcus, for instance, characterized Ruth's mental state during her final two years as "anguished," nothing more particularly she was upset by the lawsuits of her husband and sons. Ex. R-36 at 26 & 31 (Florence Marcus).

20. Ex. R-64.

his son Ronald and granddaughter Debra Perelman. On that same day, he changed his charitable trusts to remove Ruth as co-trustee. His stated reason for removing her as co-trustee was his concern that Jeffrey was trying to influence his mother.[21]

In November 2009, Raymond went to Florida for a couple of months without Ruth. Raymond maintains that he went on the advice of Ruth's physician, Dr. Crooks, to avoid the stress incurred due to the family litigation. Raymond acknowledged that Ruth was physically capable of traveling to Florida at that time.[22] According to the medical records of Dr. Crooks, Ruth's reaction to Raymond's departure was conflicted; on one hand she was relieved of the stress of his presence. On the other, she was devastated that he left her.[23] Throughout Dr. Crooks' records from April 12, 2009 until July 28, 2011, Ruth frequently confided on her sadness due to her estrangement from her husband and thoughts of divorce after so many years of marriage.[24] In March 2011, the entry of appearance of Sandra Schultz Newman, on behalf of Raymond in the lawsuit against Jeffrey, caused extreme distress for Ruth, who was aware of a close personal relationship between her husband and Ms. Newman.[25] Raymond,

---

21. 3/19/13 N.T. at 100-03, 108, 113-114 (Raymond). *See also* ex. R-57; R-58; P-16.

22. 3/19/13 N.T. at 40 & 137-38 (Raymond).

23. *Compare* ex. R-21-10 (At a 10/14/09 home visit, Ruth "is feeling better than she was, particularly if he is going to be going away") *with* ex. R-21-24 (At a 1/9/10 home visit, Ruth is "under a great deal of stress from her husband leaving her after 67 years of marriage and some lawsuits between her children").

24. *See, e.g.*, ex. R-21-22 (At 12/22/09 home visit, Mrs. Perelman is "very stressed by the pending divorce from her husband of 67 years").

25. *See. e.g.* ex. R-36 at 37 (Florence Marcus deposition).

in contrast, consistently stated that he and Ruth "were happy together" but that his son, Jeffrey, tried to make them unhappy.[26] When asked if Ruth had ever asked for separate households, he observed: "She would not and she could not live without me because we were inseparable. She could not live alone. She wasn't capable or strong enough."[27] In the spring of 2011, however, Ruth retained a Philadelphia attorney, Michael Fingerman, for advice on obtaining a divorce from Raymond in Philadelphia. Ex. R-17.

She had also privately contacted the Schnader law firm to change her will, execute a revocable trust, and change her power of attorney on July 28, 2010 after several meetings during which she appeared unaccompanied, lucid, well-coiffed and coherent.[28] With the July 28, 2010 will, Ruth removed Raymond as personal fiduciary and beneficiary.[29] The primary beneficiaries of the will and revocable trust were her son, Jeffrey and granddaughter Alison. This was consistent with a concern Ruth had expressed to her friend Florence Marcus that Ruth "wanted Alison to be as comfortably well off-I don't think it would

---

26. 3/19/13 N.T. at 96 (Raymond).

27. 3/19/13 N.T. at 39 (Raymond).

28. Ex. R-37 at 13-17 (Rosenfield videotape deposition)(describing June 16, 2010 meeting with Ruth); 3/20/13 N.T. at 14-21 (Ross). Unaccompanied, Ruth met with Schnader lawyers to discuss changing her estate planning documents on June 7, 2010, June 16, 2010 and July 28,2010. 3/20/13 N.T. at 15-18 (Ross). Mr. Ross was the primary scrivener of these documents, exs. R-1, R-2 and R-3: 3/20/13 N.T. at 15 (Ross).

29. 10/16/12 Raymond Perelman petition, ¶¶ 4-7. Raymond asserts that in Ruth's prior July 18, 1991 will, he had been the executor and primary beneficiary. *Id.* ¶5. *Compare* ex. R-1 (July 28, 2010 Will).

be possible-but as Ronnie's kids were."[30] At this time, Ruth also executed a new power of attorney and revoked a prior power of attorney that had appointed Raymond as her agent.[31] To protect Ruth's privacy and keep Raymond from seeing her check, the Schnader firm agreed not to bill Ruth for their services until after her death.[32] In drafting Ruth's will, no designation was given for Ruth's domicile. The reason for this omission was to "give flexibility to allow the will to be probated in whatever jurisdiction she would live in at the time of her death" since she had residences in New Jersey, Pennsylvania and Florida.[33] The situs of the trust Ruth executed was Pennsylvania. Ex. R-2 (Article Eleventh). When questioned as to Ruth's intentions, Roy Steven Ross, the attorney who was the primary scrivener of this new will, agreed that Ruth had said she had no intention of going back to Florida.[34] He noted that Ruth's choice of executor, Judge Arlin Adams, would not have been able to serve in that capacity under Florida law because he was neither a Florida resident nor a family member. Nonetheless, Ruth wanted him to serve as personal fiduciary even after this issue was explained to her.[35]

## Procedural History

After Ruth's death, Raymond filed a caveat with the Philadelphia Register of Wills which was subsequently

30. Ex. R-36 at 75 (Florence Marcus).
31. 3/20/13 N.T. at 27 (Ross).
32. Ex. R-33; 3/20/13 N.T. at 29-30 (Ross); ex. R-37 at 77-79 (Rosenfield).
33. 3/20/13 N.T. at 24 & 28 (Ross).
34. 3/20/13 N.T. at 24 (Ross).
35. 3/20/13 N.T. at 25 (Ross).

withdrawn. By decree of the register of wills dated October 3, 2012, the July 28, 2010 will was admitted to probate in Philadelphia with letters testamentary granted to Jeffrey Perelman, as executor. Raymond filed an appeal to this court asserting lack of jurisdiction because Ruth had been domiciled with her husband in Florida. He also asserted that the July 28, 2010 will was invalid because procured through the undue influence of her son, Jeffrey.[36] By a praecipe filed on February 22, 2013, Raymond abandoned his claim of undue influence.

Litigation was also pursued in Florida over Ruth's estate. On February 8, 2012, a circuit court judge in the fifteen judicial district in Palm Beach, probate division, issued an order that under Florida law, Ruth had died a domiciliary of Florida. Neither side, however, has raised this Florida order as being controlling or determinative.[37] Pennsylvania courts have held, for instance, that where administration of a decedent's estate is at issue, domicile is a jurisdictional prerequisite so that where domicile is claimed to be in Pennsylvania that threshold issue should be determined by a Pennsylvania court without regard to the ruling of a different state court. *Pusey's Estate*, 321 Pa. 248, 269, 184 A. 844, 853 (1936), *cert. denied* 299 U.S. 572 (1936). Accord *Lang Estate*, 15 Fid. Rep.2d 46 (Phila. O.C. 1994)(overruling preliminary objections asserting that a Florida court ruling on domicile should be accorded full faith and credit). It is well established that

36. 10/16/12 Raymond Perelman Petition.
37. While petitioner references this Florida ruling, he does not argue that this court is bound by it. *See* 4/23/13 Raymond Perelman brief at 7-8.

neither "the Fourteenth Amendment nor the full faith and credit clause requires uniformity in the decisions of the courts of different states as to the place of domicil, where the exertion of state power is dependent upon domicil within its boundaries." *Worcester County Trust Co. v. Riley*, 302 U.S. 292, 299 (1937). Since domicile would be a prerequisite for the exercise of jurisdiction over the estate at issue, this issue must be addressed anew in this proceeding.

## Legal Analysis

The domicile of a person is "where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *In re Dorrance's Estate*, 309 Pa. 151, 173, 163 A. 303, 310 (1932), *cert. denied* 287 U.S. 660 (1932). As Raymond concedes, domicile is determined by the law of the forum, which in this case is Pennsylvania.[38] *See, e.g. Greenwood v. Hildebrand*, 357 Pa. Super. 253, 259, 515 A.2d 963, 965 (1986), *app. denied* 515 Pa. 594, 528 A.2d 602 (1987). Determining a person's domicile raises a mixed question of law and fact. *Estate of Getz*, 611 A.2d 778, 780, 148 Pa. Cmwlth. 393, 397 (1992). Once a domicile is acquired, it is "presumed to continue until it is shown to have been changed" with a burden of "clear and satisfactory proof." *Estate of Loudenslager*, 430 Pa. 33, 38-39, 240 A.2d 477, 479-80 (1968). The person asserting the change in domicile has that burden of proof. *Id.* To change one's domicile, "there must be the concurrence of

---

38. 4/23/13 Raymond Perelman Brief at 9.

the following factors: (1) physical presence in the place where domicile is alleged to have been acquired, and (2) an intention to make it his home without any fixed or certain purpose to return to his former place of abode." *Publicker's Estate*, 385 Pa. 403, 405-06, 123 A.2d 655, 658 (1956). Intentions alone cannot establish domicile. Instead, a person's conduct is critical in establishing domicile. As a consequence, "a man cannot elect to make his home in one place for the general purposes of life, and another place for the purposes of taxation." *In re Dorrance's Estate*, 309 Pa. at 166, 163 A. at 308.

While a person may have many residences, he can have only one legal domicile. *In re Lesker*, 377 Pa. 411, 416-17, 105 A2d 376, 379-80 (1954). The Perelmans had residences in three states: New Jersey, Pennsylvania and Florida. To determine Ruth's domicile at the time of her death, it is necessary to focus on her intentions and conduct. This is complicated by her strained relationship with her husband. Raymond was a highly successful businessman, while Ruth was never employed outside the home. It would be easy to submerge her identity into his. In fact, Raymond argues that a husband and wife are presumed to have the same domicile, citing *Obici's Estate*, 373 Pa. 567, 576, 97 A.2d 49, 53-54 (1953). That case is distinguishable. In *Obici*, the court concluded that testimony by interested relatives that a wife intended to separate from her husband did not establish her intent to change domicile from Virginia, where she had lived with her husband for 21 years, to Pennsylvania where she moved to be cared for by her sister after becoming

ill. In fact, the *Obici* court emphasized: "Throughout the twenty-odd years of their married life, there appears no course of conduct to cause or justify any estrangement or separation." *Obici*, 373 Pa. at 575-76, 97 A.2d at 53.

In the present case, however, the respondent has presented clear, convincing and disinterested evidence based on Ruth's stated intentions and concrete actions that in the final two years of her life she was forced to assert her independence from her husband and cement her ties to her long-term home in Philadelphia. The record is clear that Ruth at no time uttered an explicit statement as to her domicile. She did not discuss this issue with her husband or physician, Dr. Crooks.[39] Nor did she clarify this point for the lawyers who drafted her July 28, 2010 will.[40] Her close friend Florence Marcus likewise testified that Ruth had never expressed whether she considered Florida or Philadelphia her home, though "it was just assumed by everybody that Philadelphia was her home. These were extra things. Atlantic City was an extra. Palm Beach was an extra." Ex. R-36 at 29-30.

This lack of an explicit statement of domicile does not preclude a determination of whether Philadelphia or Palm Beach was Ruth's home for the purposes of domicile. It

---

39. When asked "did Mrs. Perelman ever tell you that she wanted to make Florida her permanent home, "Raymond candidly replied: "We didn't discuss that." 3/19/13 N.T. at 63 (Raymond). Raymond did testify, moreover, that Ruth had told him that she preferred being where her doctors were-in Philadelphia. 3/21/13 N.T. at 74 (Raymond).

40. *See, e.g.*, 3/20/13 N.T. at 23 (Ross)(no geographic reference was given in Ruth's July 28, 2010 will because "Mrs. Perelman did not know what her residence would be at the time of her death" although she had no intention of going back to Florida).

is well established that "declarations alone of domicile are self-serving and insufficient; they must be followed by acts which are in accordance with the declarations." *Alburger v. Alburger*, 138 Pa. Super. 339, 344, 10 A.2d 888, 890 (1940). Instead, it is therefore necessary to focus on her actions as to where she made her home.

For forty years until the day of her death, Ruth had lived in the same home in Philadelphia. Her social network of friends was in Philadelphia. As a generous philanthropist with her husband Raymond, the lion's share of her contributions were directed to charities located in Philadelphia. While she began to spend winters in Palm Beach with her husband beginning in the 1990's, she always returned to her same home on Rittenhouse Square. After April 2009, she refused to return to Florida. This refusal stemmed in part from her growing estrangement from her husband, and in part from her deteriorating health which made her more dependent on the unique medical connections she had established in Philadelphia.

Up until her death, Ruth remained lucid, and, as her friend Florence Marcus and attorney, Bruce Rosenfield, observed, she knew what she wanted.[41] Ruth was a loving mother and wife who deeply valued her privacy and her family. The lawsuits between her husband and son Jeffrey and the resulting publicity caused her deep anxiety and stress. Even before the lawsuits were filed, she had expressed her resistance to Raymond's attempt to

---

41. *See, e.g.* exs. R-36 at 24 (Florence Marcus deposition); R-37 at 26 (Bruce Rosenfield deposition)("She knew what she wanted").

control and dominate.[42] The lawsuits between her husband and son, however, inspired Ruth to take concrete-albeit stealthy-actions to assert her independence.

In the winter of 2009-2010, Ruth did not travel to Florida with her husband despite her physician's encouragement that she join her "estranged" husband.[43] In June 2010, Ruth initiated a series of meetings with lawyers from the Schnader law firm to change her estate planning documents to omit her husband as beneficiary, fiduciary and agent under her power of attorney. She attended two meetings unaccompanied at the Schnader offices, where she asked questions while discussing her family and assets. After each meeting, revisions were made to the documents. Ruth executed a new will, trust agreement and power of attorney on July 28, 2010 in her Rittenhouse home. Raymond was not provided for in her will except for references to personal and household items. He was not named executor. He was not named agent under her new power of attorney. The will did not specify a geographic domicile, though the situs of the trust is Pennsylvania. In naming Judge Adams as executor, she was informed that he would be unable to serve in Florida because he was neither a Florida resident nor a relative, but Ruth indicated

---

42. R-21-02 (medical notes that Ruth "was upset and very distress (sic) and very concerned about his controlling and wanting to take charge of everything."). This attempt to dominate came out not just in minor aspects of her life as restricting phone calls from friends after 8 p.m. but in such major ways as Raymond's directive that her physician conceal her diagnosis of CLL. 3/21/13 N.T. at 16 & 32 (Dr. Crooks).

43. Ex. R-21-25 (January 20, 2010 Home Visit); 3/21/13 N.T. at 61 (Dr. Crooks). According to Florence Marcus, Ruth's last winter in Florida had not been happy because she had nothing to do, and they weren't going any place. Ex. R-36 at 37.

that she had no intention of returning to that state.[44]

Several months later, Sandra Schultz Newman made an entry of appearance in March 2011 on behalf of Raymond in his litigation with his son Jeffrey which greatly distressed Ruth.[45] In the Spring of 2011, Ruth retained a divorce attorney. Ex. R-17. These concrete actions establish her independent spirit, which must be considered in determining her domicile and distinguish her actions from those of Raymond.

An extremely important bond between Ruth and Philadelphia was the excellent medical care that was available to her. In fact, beginning in the 1990's she established a long-term doctor-patient relationship with Dr. Crooks, who was her primary physician until her death on July 31, 2011.[46] Raymond testified that Ruth had been diagnosed with CLL in the 1950's, but he had instructed her physicians not to reveal this diagnosis to her. Dr. Crooks yielded to this policy that had been adopted by his predecessor. He noted, however, that Ruth had lived with CLL for 50 years, which was unprecedented since the average survival rate is only ten years. The family made the right decision to spare Ruth this added anxiety, Dr. Crooks concluded, though it is not something that would be done today.[47] According to Dr. Crooks, Ruth's condition, and the efforts necessary to keep the CLL

44. 3/20/13 N.T. at 13-30 (Ross).

45. *See ex.* R-5 (Entry of Appearance); 3/21/13 N.T. at 77 (Raymond) (testimony from the January 20, 2013 Florida proceeding read into record without objection); ex. R-36 at 37 (Florence Marcus).

46. 3/21/11 N.T. at 15 (Dr. Crooks).

47. 3/19/13 N.T. at 32 (Raymond); 3/21/13 N.T. at 15-16 (Dr. Crooks).

diagnosis from her as her condition deteriorated, created a special relationship.[48] The medical records kept by Dr. Crooks document how increasingly crucial it was for Ruth to remain in Philadelphia.

After returning from Florida in April 2009, Ruth fell and broke her hip. She was admitted to Pennsylvania hospital on April 30, 2009 and released on May 6, 2009 Ex. R-21-3. Although Ruth's hip eventually healed, at that point the CLL began to affect her organs. 3/21/13 N.T. at 19 (Dr. Crooks). Throughout this period until Ruth's death in July 2011, Dr. Crooks met with Ruth frequently. He estimated that he saw her nearly every week, often making house calls that could last up to two hours. In her last year, Dr. Crooks made 58 house calls. 3/21/13 N.T. at 17. In March 2010, Ruth developed pleural effusion and was hospitalized so that a tube could be inserted and then removed from her chest. By November 2010, the tube had to be permanently reinserted.[49] In addition to tending to her health issues, Dr. Crooks counseled her on the stress and anxiety arising from the family conflicts and litigation. Their chief topic of conversation was the legal battle between her husband Raymond and son Jeffrey: "Family was very important to her and I think particularly as this disagreement in the family became public, she was very, very upset." 3/21/13 N.T. at 31 (Dr. Crooks). His notes indicate that Ruth spoke to him frequently about her estrangement, separation or divorce from her husband

---

48. 3/21/11 N.T. at 16 (Dr. Crooks).
49. 3/21/13 N.T. at 23-28 (Dr. Crooks).

after 67 years which she found very distressing.[50] In the fall of 2009, Raymond went to Florida without Ruth.[51] Ex. R-21-9. Although Dr. Crooks encouraged Ruth to go to Florida to see her "estranged" husband, she did not do so.[52] Ruth's friend, Florence Marcus, likewise, testified that Ruth had told her she wanted a divorce. Ex. R-36 at 33.

Dr. Crooks' notes also reflect Ruth's growing dependence on him and her increased anxiety whenever he went away on a trip.[53] By June 2010, Ruth had become

50. *See, e.g.* ex. R-21-6 (9/1/09 Home Visit); ex. R-21-7 (9/17/09 Home Visit; discussed divorce; Ruth "does not want to live this way at 88 years of age"); ex. R-21-8 (9/25/09 Home Visit: three phone calls and 2 hour discussions with Ruth about separating from her husband); R-21-20 (12/16/09 Home Visit spoke of "her husband and their separation"); R-21-22 (12/23/09 Home Visit: Ruth "is very stressed by the pending divorce from her husband of 67 years..."); R-21-24 (1/9/10 Home Visit Ruth "is under a great deal of stress from her husband leaving her after 67 years of marriage"); R-21-26 (1/27/10 Home Visit); R-21-28 (2/12/10 Home Visit); R-21-55 (8/17/10 Home Visit); R-21-78 (6/1/11 Home Visit: Ruth "is very serious conflict with her husband and even after 70 years of marriage, there is talk of divorce").

51. 3/19/13 N.T. at 39-40 (Raymond); Ex. R-21-9.

52. 3/21/13 N.T. at 61 (Dr. Crooks); Ex. R-21-25 (1/20/10 Home Visit).

53. Ex. R-21-34 (4/3/10 Home Visit: "Mrs. Perelman was very anxious about me leaving town"); R-21-37 (5/2/10 Home Visit: Ruth is "was anxious that I was leaving town"); R-21-38 (5/10/10 Home Visit "I spoke to Mrs. Perelman last week twice from England"); R-21-47 (7/7/10 Home Visit: Ruth called Dr. Crooks 5 times over the weekend due to concern about her cough); R-21-53 (8/9/10 Home Visit: Ruth called Dr. Crooks "over 5 times with great distress over the weekend"); ex. R-21-56 (8/19/10 Home Visit: 8 phone calls from Ruth's sons, her husband visiting doctor sent by her son, her nurses and Ruth); ex. R-21-59 (8/26/10 Home Visit: Ruth is concerned about Dr. Crooks going away); R-21-60 (9/2/2010 Home Visit: Ruth "has called me every day since last Wednesday. I had spoken to her on Thursday, Friday, Saturday, Monday and Wednesday...."); ex. R-21-63 (10/4/10 Home Visit: Ruth demanded that Dr. Crooks see her at home tonight); R-21-72 (1/20/11 Home Visit: Ruth called Dr. Crooks every day this week); R-21-75 (3/8/11 Home Visit: Dr. Crooks spoke to Ruth "three times last week while I was away"); R-21-79 (6/23/11 Home Visit: Ruth called three times while Dr. Crooks was in England)

distraught over her failing health.[54] In October 2010, Dr. Crooks was concerned about the pleural effusion Ruth had developed and her unawareness that she had CLL which rendered treatment more difficult. Although he raised the issue with Raymond of telling her that she had CLL, he did not agree.[55] By November 25, 2010, Ruth was on home oxygen and "very frustrated with her declining health."[56] In early December, Dr. Crooks and Ruth had a long talk about end of life and dying "which we have gone over in detail with her."[57] In July 2011, Ruth's close friend Florence Marcus drove her from her Rittenhouse Square apartment to the University of Pennsylvania hospital where Ruth died.

In her declining health, Ruth's attachment and reliance on the care she received from her doctor and the excellent medical facilities in Philadelphia strengthened her bond to that city. The Philadelphia area was where her close friends and various family members lived. The excellent care she received sustained her life. It was vital to her. There is no evidence whatsoever that Ruth at any time after April 2009 yearned to return to Florida or to leave her Philadelphia home.

Despite this compelling evidence that Ruth was domiciled in Philadelphia at the time of her death, the petitioner counters that Ruth's domicile was in Florida. At the hearing, counsel for Raymond agreed that he had

---

54. Ex. R-21-46 (6/30/10: Home Visit).
55. Ex. R-21-64 (10/21/10 Office Visit); Ex. R-21-67 (11/25/10 Home Visit)
56. Ex. R-21-67 (11/25/10 Home Visit).
57. Ex. R-21-69 (12/3/10 Office Visit).

the burden of showing change of domicile,[58] but in his brief he asserts that Ruth was domiciled in Florida as of 1996.[59] Jeffrey's position is more nuanced. Although he argues that Ruth never made Florida her home, he also maintains that at the time of her death Ruth was domiciled in Philadelphia because "[r]egardless of where Ruth may have been domiciled prior to 2009, it is undisputed that Ruth lived in Philadelphia continuously for more than two years before she died and did not go to Florida once during that time."[60] The main thrust of Jeffrey's evidence focuses on the period after April 2009. The burden of showing this change of domicile is greater than required to show a continued domicile. *Estate of Loundenslager*, 430 Pa. 33, 39, 240 A.2d 477, 480 (1968). But when all the evidence is distilled, Jeffrey presented clear, convincing and disinterested evidence that at the time of her death, Ruth was domiciled in Philadelphia.

To support his contention that Ruth was domiciled in Florida, Raymond emphasizes various other factors: Ruth and Raymond purchased their home in Palm Beach in 1992; they filed for the Florida Homestead Exemption in 1996; they registered to vote in Florida; they obtained a Florida driver's license. Ruth voted in Florida fifteen

---

58. The Court: There has been very little discussion about burden. Since I see you rising, Mr. Eckert, I assume you are accepting the burden?
   Counsel for petitioner: Correct.
   The Court: And that is to say the burden of showing a change of domicile?
   Counsel for petitioner: Correct.
3/19/13 N.T. at 8.
   59. *See* 4/23/13 Raymond Perelman brief at 2 ("Mrs. Perelman remained a Florida domiciliary from 1996 util her death....")..
   60. 4/23/13 Jeffrey Perelman brief at 2.

times and obtained a Florida identification card in March 2001 after she stopped driving. In their joint federal tax returns beginning in 1996, Ruth and Raymond gave their home address as 965 North Ocean Boulevard, Palm Beach Florida.[61]

Respondent Jeffrey Perelman urges that this paper trail of documentation was created by Raymond primarily for tax purposes and should not determine Ruth's domicile. In support, he cites two landmark cases by the Pennsylvania Supreme Court: *In re Dorrance's Estate*, 309 Pa. 151, 163 A. 303 (1932) and *Estate of Reighard*, 381 Pa. 304, 113 A.2d 305 (1955). Dr. John Dorrance was a brilliant businessman who amassed a fortune as the head of Campbell Soup Company, a New Jersey corporation with offices in Camden, New Jersey. Up until 1925, Dorrance resided with his family at his home "Pomona Farms" in New Jersey. In 1925, he purchased a large estate, "Woodcrest," in Pennsylvania. The *Dorrance* court concluded that at the time of his death, Dr. Dorrance had been domiciled in Pennsylvania despite his efforts on the advice of counsel to claim New Jersey as his domicile for tax advantages and estate planning purposes. Dorrance and his wife, for instance, executed an agreement that their residence would remain in New Jersey despite their occupancy of "Woodcrest" in Pennsylvania and that they would refrain from voting anywhere other than in New Jersey. 309 Pa. at 159, 163, 163 A. at 305, 307.

---

61. 4/23/13 Raymond brief at 1-5; *see* exs. P-1; P-8; P-5: P-7; & P-29.

In analyzing the facts before it, the *Dorrance* court applied the two part test focusing on "physical presence in the place where domicile is alleged" and "intent to make that place the home of the party." 309 Pa. at 173, 163 A. at 310. The mere expression of intent to claim a domicile, however, did not suffice. As the *Dorrance* court observed, on "the question of domicile less weight will be given to the party's declaration than to his acts" with primary emphasis on "the evidence supplied by the daily life of the individual and his acts and conduct." 309 Pa. at 169-170, 163 A. at 309 (citations omitted). In concluding that Dr. Dorrance was a domiciliary of Pennsylvania despite his expressed intention of claiming a New Jersey domicile, the court emphasized that he had resided at Woodcrest in Pennsylvania for 5 years prior to his death "purposely making his home in a neighborhood more congenial to his family and more suitable to his condition in life than the New Jersey location which he left." 309 Pa. at 174, 163 A. at 311. In other words, "Woodcrest" was his home in fact to which the family always returned and which was considered his home by his friends and acquaintances.

In the subsequent case of *Estate of Reighard*, the Pennsylvania Supreme Court applied the principles set forth in *Dorrance* to facts more analogous to the instant case. The decedent, David Reighard, spent his winters in Florida. Even though Reighard placed Florida license plates on his car, claimed the Florida homestead exemption, declared himself a Florida resident to register to vote in that state, and paid Florida resident personal property taxes, Justice Musmanno concluded that "these incidents

were but fluttering leaves of transitory expression in no way affecting the trunk of the domiciliary tree whose roots sunk deep in Pennsylvania soil." *Estate of Reighard*, 381 Pa. 304, 308-09, 113 A.2d 305, 307 (1955). These formal expressions of intent to establish a Florida domicile for tax purposes were outweighed by Reighard's continuous residence in Pennsylvania, his maintenance of a bank account in Pennsylvania rather than Florida, and his burial in Pennsylvania. In distinguishing between the factors that reflected Reighard's intention to gain favorable tax treatment, and those to settle in a true home, the *Reighard* court emphasized: "Every person must have a domicile somewhere and a man cannot elect to make his home in one place for the general purposes of life, *and in another place for the purposes of taxation*." *Estate of Reighard*, 381 Pa. at 308, 113 A.2d at 307 quoting *Estate of Dorrance* (emphasis supplied by *Reighard* court).

In a similar domicile case where a testator divided his time between Pennsylvania and Florida, the Commonwealth Court in *Estate of Getz*, 148 Pa. Cmwlth. 393, 611 A.2d 778 (1992) found a Pennsylvania domicile even where the decedent lived in Florida from October to May, obtained a Florida homestead exemption, registered his vehicle in Florida and registered to vote in Florida. The *Getz* court acknowledged that these acts were evidence of an intent to change domicile, but they were outweighed by the decedent's burial in Pennsylvania, his listing of a Pennsylvania address on federal income tax returns, and the attesting of a Pennsylvania domicile in his will.

The overall significance of these Florida cases is that

the factors Raymond emphasizes as establishing Ruth's domicile in Florida-the homestead exemption, the Florida voting record, the Florida driver's license or identification card-are not determinative but must be weighed in the broader. context of Ruth's life and home decisions. This is particularly true where, as in this case, a strong-willed, financially astute husband-like Dorrance or Raymond Perelman-makes conscious decisions for tax purposes. In his testimony in various forums, Raymond has conceded that tax considerations influenced some of his residential decisions. Raymond testified before this court, for instance, that each November, he and Ruth traveled to Florida and did not return until May, admitting that this schedule was motivated by his understanding that "[i]f I wanted to take advantage of the tax situation, I had to follow the regulations for it so I did it," noting "wouldn't it be stupid not to?"[62] When initially questioned at the court hearing whether one reason he pursued a Florida residence was to obtain the tax advantages of the homestead exception, Raymond denied this had been a motive. He was confronted, however, with his prior testimony before the Register of Wills in which he had cited the tax advantages and the homestead act as why his residence was in Florida. Moreover, Raymond's accountants had prepared a chart of those tax advantages.[63] In the January 20, 2012 Florida proceeding, he admitted that he had previously claimed New Jersey as a residence for tax reasons: "there was a time frame when I bought the house in New Jersey and the New Jersey state taxes

---

62. 3/19/13 N.T. at 57 (Raymond).
63. 3/19/13 N.T. at 44-48 (Raymond); ex. P-4 (Chart of tax savings).

was considered to be less than the Philadelphia. And since I owned a home there and we spent a lot of time there, I used New Jersey as a residence," in order to save taxes.[64] The record strongly suggests that decisions such as these were made by Raymond. He conceded, for instance, that Ruth did not play a role in the preparation of his tax returns; instead, "she looked to me."[65] The effect of those decisions on Raymond's domicile is not at issue here. When weighed against the real concerns of Ruth's life, however, they do not suffice to establish a Florida domicile for her.

The respondent presented clear, convincing, disinterested evidence that after April 2009, Ruth became estranged from her husband which caused her to deepen her ties to Philadelphia. In the winter of 2009-10, for instance, Raymond traveled to Florida, but Ruth did not, even though Raymond acknowledged that she had been physically capable of doing so. Another compelling factor in Ruth's decision to live in Philadelphia was her need for the excellent medical care. As Raymond admitted, she preferred being in Philadelphia where her doctors were.[66] Her friend, Florence Marcus, likewise testified that Ruth had told her that she could not go back to Florida because of her health.[67] The notes of Dr. Crooks document her

---

64. 3/21/2013 N.T. at 80 (testimony of Raymond Perelman at the January 20, 2012 Florida proceeding read into the record by Mr. Smith without objection)

65. 3/21/13 N.T. at 76 (November 16, 2011 Raymond Perelman deposition at 72 read into record without objection).

66. 3/21/13 N.T. at 74 (November 16, 2011 Raymond Perelman deposition at 37 read into the record without objection)

67. Ex. R36 at 29 (Florence Marcus)

numerous calls and increasing dependence on him for both emotional support and medical care as her health deteriorated while her mind remained lucid. It is true, as petitioner asserts, that change of residence "for purposes of health or other unavoidable necessity will not result in loss of that domicile." *Dorrance Estate*, 309 Pa. at 170, 163 A. at 309. Here, however, Ruth was not a passive patient who changed her residence late in life due to a medical emergency. Instead, throughout her life, she had established her network of medical resources where her long-term home was in Philadelphia. If, as petitioner argues, Palm Beach had been her true home, she would have created her medical support network there. She did not. In selecting to be in close proximity to her doctor, Ruth was exercising her own free will which is a critical consideration in determining domicile. *In re Publicker's Estate*, 385 Pa. at 413,123 A.2d at 661-62 (intent to remain in close proximity to physician immaterial if decedent exercised her own free will to remain in Philadelphia). This was not the case of a frail, elderly person who is removed from her longstanding home for care by a relative in another county. *See, e.g., Estate of Loudenslager*. 430 Pa. 33, 240 A.2d 477 (1968)(where decedent left Philadelphia for daughter's home in Montgomery county due to frail health and then remained there for only 2 weeks, her domicile remained in Philadelphia). Ruth had lived in Philadelphia since 1970; she had been treated there by her long-term physician in Philadelphia since the early 1990's; the bulk of her philanthropic contributions were directed to charities located in Philadelphia; her friends and family were near Philadelphia; she was buried in Philadelphia

with other Perelman relatives. Based on the exercise of her free will, at the time of her death, Ruth Perelman's domicile was in Philadelphia.

## Conclusion

The focal point for the issue of Ruth Perelman's domicile is on her actions and intentions. The petitioner presented just one, interested witness, her husband Raymond, who repeated the mantra that they had been happily married for 70 years and she could not live without him.[68] The petitioners, in contrast, presented an array of disinterested, highly credible witnesses with nuanced insight into Ruth's actions and intentions in response to her anguish over the litigation between her husband and son: her longtime friend, her primary physician of 20 years who maintained contemporaneous, disinterested notes, her stalwart lawyers at the Schnader firm who helped her write Raymond out of her will and power of attorney-and then delayed their billing so that he would not know what she had done.[69] Based on this record, the respondents presented clear, convincing and disinterested evidence that Ruth had been a domiciliary of Philadelphia from at least April 2009 when she returned to her home on Rittenhouse Square, never to return to Florida or express any intent to do so.

---

68. 3/19/13 N.T. at 38, 41, 96, 153 (Raymond).

69. *See, e.g.,* ex. R-37 (testimony of Bruce Rosenfeld); Ex. R-82 (deposition of Judge Arlin Adams); 3/20/13 N.T. at 13-36 (Roy Steven Ross). Raymond brought a legal action against Judge Adams and sought to have Dr. Crooks removed from his faculty position. 3/19/13 N.T. at 136 & 167 (Raymond).